[No. 56705-1.   En Banc.   February 6, 1992.]

SHEILA ROY, *Individually and as Guardian, Respondent,* v. THE CITY OF EVERETT, ET AL, *Petitioners.*

*Bruce E. Jones, City Attorney,* and *Mark T. Patterson, Assistant; Edwards, Sieh, Wiggins & Hathaway,* by *Catherine Wright Smith* and *Malcolm L. Edwards,* for petitioners.

*Katrina C. Pflaumer; Peter K. Mair* and *Mair, Abercrombie, Camiel & Rummonds,* for respondent.

*Richard L. Andrews, Bellevue City Attorney,* and *Lori Molander* and *David E. Kahn, Assistants,* on behalf of Washington State Association of Municipal Attorneys, amicus curiae for petitioners.

*Christine Lamson* and *Michael W. Gendler* on behalf of Northwest Women's Law Center, the American Civil Liber-

ties Union of Washington, and Washington State Coalition Against Domestic Violence, amici curiae for respondent.

DOLLIVER, J. — Sheila Roy brought this action on behalf of herself and her daughter in May 1986, following a reign of terror beginning in October 1983, during which Milton Glenn relentlessly and violently pursued and abused her. Roy sought damages against Snohomish County, members of its prosecutor's office, the City of Everett and members of its police department, and Glenn's estate. (Glenn had killed himself during his final assault on Roy on October 5, 1984.) The claim against Snohomish County and its prosecutors was dismissed on the grounds of prosecutorial immunity. Petitioners here are the City of Everett, the Everett Chief of Police and certain Everett police officers.

In her complaint, plaintiff alleged defendants failed to protect her, which failure constituted negligence, gross negligence, wanton misconduct, and outrage; violated their duties under RCW 10.99.070, the domestic violence act; failed to train and supervise; violated equal protection provisions of the Washington Constitution and RCW 49.60; and violated 42 U.S.C. § 1983. Her complaint does not allege any misconduct by the police in the course of an arrest or other, on-the-scene action such as entering the home to break up a fight. Rather, plaintiff claims there was a yearlong pattern by the Everett Police Department of nonenforcement of the law and failure to take adequate steps to protect her from her assailant. The issue here is whether the yearlong pattern of inaction is immunized under RCW 10.99.070. We hold it is not.

Defendants moved for summary judgment asserting they were immune from suit under RCW 10.99.070. The statute provides:

> A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission in good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident.

The trial court denied defendants' motion for summary judgment under the claim of immunity. In its memorandum opinion, the trial court concluded:

[T]o rely on that language [RCW 10.99.070] to completely immunize the defendants . . . would undercut the purpose of the Domestic Violence Act which is to recognize the necessity of early intervention in domestic violence cases. . . . If I am to give substance to the immunity provisions of the statute, I must construe it narrowly because of the wording of the intent section. When RCW 10.99.010 and 10.99.070 are read together, the latter grants immunity only for conduct in the course of an arrest or other on the scene action such as entering a home to break up a fight . . ..

Memorandum Decision on Defendant's Motion for Summary Judgment (Memorandum Decision), at 2-3. The court further ruled that:

Defendant City and police officers' immunity under RCW 10.99.070, construed in light of the entire Domestic Violence Act, is limited to conduct in the course of an arrest or other on-the-scene action such as entering a home to break up a fight. Since Plaintiff Roy's suit is not based on such conduct, it is not barred by the immunity section of the domestic violence law, and therefore defendant's motion on that issue is denied.

Order on Parties' Motion for Summary Judgment (Order), at 1. The court also rejected the defendants' claim that qualified immunity precluded their liability for Roy's claims because "[m]aterial issues of fact exist as to whether defendants' conduct was objectively reasonable . . .". Order, at 1-2.

Defendants interpret the words in RCW 10.99.070, "any other action or omission", as giving police officers — and the entities for which they work — absolute immunity from any claim based on domestic violence, unless it can be proved the officers acted in bad faith. Under this view neither negligent failure to enforce the law nor failure on the part of a police department to develop procedures to protect victims of domestic violence would suffice to abrogate this immunity. RCW 10.99.070, however, was not enacted in a vacuum. As the trial court correctly noted, it is a part of, and must be read in light of, the general purpose and intent

of the domestic violence act. The statement of intent in RCW 10.99.010 reads:

> The purpose of this chapter is to recognize the importance of domestic violence as a serious crime against society and to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide. The legislature finds that the existing criminal statutes are adequate to provide protection for victims of domestic violence. However, previous societal attitudes have been reflected in policies and practices of law enforcement agencies and prosecutors which have resulted in differing treatment of crimes occurring between cohabitants and of the same crimes occurring between strangers. Only recently has public perception of the serious consequences of domestic violence to society and to the victims led to the recognition of the necessity for early intervention by law enforcement agencies. It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated. Furthermore, it is the intent of the legislature that criminal laws be enforced without regard to whether the persons involved are or were married, cohabiting, or involved in a relationship.

That statement of intent is crucial to the case before us and explains why the "any other action or omission" language must not be interpreted as broadly as the defendants suggest, so broadly that it would vitiate the rest of RCW 10.99.

Over the lengthy period of time during which Milton Glenn terrorized and abused Sheila Roy, she was unsuccessful in stopping the violence. This lack of success might be attributable to any of a number of factors — among them, lack of societal comprehension of the problems relating to domestic violence, lack of enforcement of existing laws by the police, or failure on her own part to follow up on the complaints she made. It is not for us to determine on appeal from a denial of summary judgment for defendants, however, whether Roy may have been partially responsible for the fact that the laws protecting her were not adequately enforced. That is for the jury to decide, after weighing all the evidence. What this court can and must determine is the proper interpretation of RCW 10.99.070.

■■ As we noted in *Seven Gables Corp. v. MGM/UA Entertainment Co.*, 106 Wn.2d 1, 6, 721 P.2d 1 (1986):

> In construing statutes, the goal is to carry out the intent of the Legislature. In doing so, it is the duty of the court in interpreting a statute to make the statute purposeful and effective. Any statutory interpretation which would render an unreasonable and illogical consequence should be avoided. Thus, in attempting to effect the intent of the Legislature, an act must be construed as a whole, harmonizing all provisions to ensure proper construction.

(Citations omitted.) Similarly, a unanimous court in *Anderson v. Morris*, 87 Wn.2d 706, 716, 558 P.2d 155 (1976) stated:

> [I]f alternative interpretations are possible, the one that best advances the overall legislative purpose should be adopted. . . . "The primary objective of statutory construction is to carry out the intent of the legislature." *Anderson v. O'Brien*, 84 Wn.2d 64, 67, 524 P.2d 390 (1974). Legislative intent is to be determined in the context of the entire statute, interpreted in terms of the statute's general purpose.

Indeed, in *In re R.*, 97 Wn.2d 182, 187, 641 P.2d 704 (1982), this court went so far as to state:

> In resolving a question of statutory construction, the spirit and intent of the law should prevail over the letter of the law. Furthermore, if an act is subject to two interpretations, that which best advances the legislative purpose should be adopted.

(Citations omitted.)

■■ The language of RCW 10.99.070, particularly that portion regarding actions or omissions in good faith by peace officers, is less than a model of clarity. Nonetheless, we fully concur with the observation of the trial court that "to rely on that language to completely immunize the defendants in the instant case would undercut the purpose of the Domestic Violence Act which is to recognize the necessity of early intervention in domestic violence cases." Memorandum Decision, at 2. The trial court properly ordered that:

> Defendant City and police officers' immunity under RCW 10.99.070, construed in light of the entire Domestic Violence

Act, is limited to conduct in the course of an arrest or other on-the-scene action such as entering the home to break up a fight.

Order, at 1.

The trial court's decision is in keeping with our statement in *PUD 1 v. Public Empl. Relations Comm'n,* 110 Wn.2d 114, 120, 750 P.2d 1240 (1988) (quoting *Roza Irrig. Dist. v. State,* 80 Wn.2d 633, 637-38, 497 P.2d 166 (1972)) that "if [statutory] language is susceptible of two constructions, one of which will carry out and the other defeat the manifest object [of the statute], it should receive the former construction.'" *See also Human Rights Comm'n v. Cheney Sch. Dist. 30,* 97 Wn.2d 118, 121, 641 P.2d 163 (1982) (in order to give effect to the intent of the Legislature, an ambiguous statute "must be read as a whole; intent is not to be determined by a single . . . phrase"). Similarly, in *State v. Leech,* 114 Wn.2d 700, 790 P.2d 160 (1990), we unanimously and explicitly rejected a literal interpretation of the words "in furtherance of " in the statute defining first degree arson, holding that a literal interpretation would yield absurd results. *Leech,* at 708-09. To enact a statute with the stated intent of ensuring enforcement of laws prohibiting domestic violence, but to include within it a blanket grant of immunity for peace officers as to any action or inaction relating to a domestic violence situation, as defendants assert the Legislature did, would be absurd in every sense of the term.

The defendants' reading of RCW 10.99.070 would make a mockery of the Legislature's clearly stated intent "to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide." RCW 10.99.010. RCW 10.99 created no new crimes but rather emphasized the need to enforce existing criminal statutes in an evenhanded manner to protect the victim regardless of whether the victim was involved in a relationship with the aggressor. As specifically stated by the Legislature, the purpose and intent of RCW 10.99 was to counteract the societal and historical tendency not to enforce laws against domestic violence, to emphasize the

need for enforcement of existing laws, and to provide guidance to law enforcement agencies in how to go about enforcing them and to protect peace officers from suit when they, in good faith, attempt to enforce the law in an incident involving domestic violence.

An interpretation of RCW 10.99.070 that protects law enforcement agencies which fail to enforce the laws defeats the stated purpose of the statute as a whole. The statute is designed to protect law enforcement officers in their good faith actions involving an "incident of domestic violence" (RCW 10.99.070), not from the failure to take action, as was the case here, in a series of events occurring in the period of over a year. If the Legislature had intended to create blanket immunity for *all* injuries arising out of interaction between police and parties to domestic violence, the statute could have been written so explicitly. RCW 10.99.070 should be interpreted in a way which harmonizes with the intent of the rest of the domestic violence act.

In *Guffey v. State*, 103 Wn.2d 144, 152, 690 P.2d 1163 (1984), we stated a rule which immunized police officers from liability when they "carrie[d] out a statutory duty". The *Guffey* rule still stands with regard to police conduct in situations which do not involve domestic violence. In contrast, the defendants' new rule would provide for blanket immunity in domestic violence cases even when police *fail* to enforce the law. Thus, the defendants' interpretation of RCW 10.99.070 actually places persons seeking to enforce the laws against domestic violence in a worse situation than if RCW 10.99 had never been passed because police immunity would be broader in domestic violence cases than in cases involving the same crime (assault, burglary, kidnapping, etc.) between strangers.

The rule of ejusdem generis reinforces the contention that RCW 10.99.070 should be read narrowly:

> The *ejusdem generis* rule requires that general terms appearing in a statute in connection with specific terms are to be given meaning and effect only to the extent that the general terms suggest items similar to those designated by the

specific terms. In short, specific terms modify or restrict the application of general terms where both are used in sequence.

*Dean v. McFarland*, 81 Wn.2d 215, 221, 500 P.2d 1244, 74 A.L.R.3d 378 (1972), *quoted in Condit v. Lewis Refrigeration Co.*, 101 Wn.2d 106, 111, 676 P.2d 466 (1984). RCW 10.99.070 lists two specific actions: "an arrest based on probable cause," and "enforcement in good faith of a court order," and then adds "or any other action or omission". Under ejusdem generis, the final phrase should be interpreted to read "or any other *similar* action or omission"; that is, the statute immunizes peace officers for injuries arising out of events *like* arrests and enforcement of court orders.

The ruling of the trial court is upheld.

UTTER, BRACHTENBACH, DURHAM, and SMITH, JJ., and CALLOW, J. Pro Tem., concur.

ANDERSEN, J. (concurring in the result) — This case has proceeded no further than the pleading stage. Upon reviewing the record before us, it cannot fairly be said that there is "no genuine issue as to any material fact" as required before a summary judgment may be entered. *See* CR 56(c). Accordingly, the trial court did not err in denying the motions for summary judgment here in question.

GUY, J., concurs with ANDERSEN, J.

DORE, C.J. (dissenting) — The majority holds that the immunity which RCW 10.99.070 grants peace officers shields the officers only from liability for actions like an arrest or action taken to enforce a court order. Because the majority's interpretation distorts the language of RCW 10.99.070 and defeats the purpose of the domestic violence act, I dissent.

The majority, through inadvertence or design, entirely ignores the facts. An understanding of the peace officers' conduct in Roy's case, however, is essential to an intelligent

review of the trial court's decision. General references to police indifference or inaction are inadequate. I therefore will present the facts more fully than does the majority, because it establishes that the police in the subject case promptly responded on every occasion on which they were summoned.

## FACTS

On October 5, 1984, at approximately 6:15 a.m., Milton Glenn went to his girl friend Sheila Roy's apartment and knocked on Roy's door. Roy "screamed out the door to go away". Glenn "went around to the bedroom window and kicked in the glass". Roy "heard the glass breaking, . . . saw [Glenn's] leg coming through, . . . ran to the front door . . . [and] headed down the stairs . . .." Roy "walked . . . to the nearest apartment, . . . across from [hers], knocked on the door, . . ." and when the resident answered, asked if she could use the phone. Glenn pursued Roy to the neighbor's apartment and shot at Roy three times. Glenn wounded Roy and fatally shot himself. Another neighbor, who heard the sound of breaking glass and saw Glenn standing in the doorway of Roy's apartment, called the police, who arrived at 6:20 a.m.

The events of October 5, 1984, ended a tumultuous yearlong relationship between Glenn and Roy, during which Glenn periodically lived with Roy and her children. Incidents of violence punctuated the relationship. On October 6 and 7, 1983, Glenn kicked and slapped Roy. Roy reported these incidents to the police and on each occasion officers responded to her calls. On October 11, 1983, police asked Roy to file a written statement about the October 6 and 7 assaults. Roy did not wish to pursue the complaint and submitted a written statement confirming that she did not wish to press charges. Police closed the case due to lack of participation by the complainant.

On October 18, 1983, Glenn threw Roy to the ground, kicked and hit her, and twisted her arm. Roy went to the hospital for treatment, leaving Glenn at the apartment. The

next day, October 19, Roy reported to the police that Glenn assaulted her, slashed her waterbed, and that $250 was missing from her bedroom. Police came to Roy's home in response to the report, but Glenn was not there when they arrived.

On October 25, 1983, police asked Roy to complete a written statement about the assault and alleged theft. Roy stated that she would call later and set up an appointment to complete the report. On October 27, an officer called Roy's home to ask about the written statement. Roy was not at home, so the officer asked that Roy return the call. On October 31, 1983, police closed Roy's case because Roy would not return their phone calls or submit a written statement.

On December 5, 1983, Glenn slapped Roy. Roy called the police, who responded and brought her to her parents' home.

On January 5, 1984, Glenn hit Roy and "slammed" her into the kitchen wall, then dragged her into the bedroom, threw her onto the bed, pointed a gun at her, and threatened to shoot her. He pulled the trigger of the gun three times, but the weapon was not loaded. Glenn then dragged Roy into the living room, where they remained until approximately 5 a.m., when Roy went into the kitchen. Glenn tried to drag Roy from the kitchen and Roy threw pans at him. Roy, who was pregnant, felt sharp contractions.

A neighbor of Roy called the police. Officers responded to the call and took Roy to the hospital. Roy refused to tell the officers what had occurred. Glenn entered Roy's hospital room and harassed her until hospital personnel threatened to call the police if he did not leave.

On January 6, Community Service Officers (CSO's) drove Roy from the hospital to her apartment. Roy saw Glenn's car at her home and became upset. CSO Campbell called a police officer to the scene. Several police officers responded and the officers, the CSO's, and Roy entered the apartment. While the police officers went into the bedroom, where

Glenn was sleeping, Roy and the CSO's stayed in the living room.

Roy told the CSO's that Glenn held a gun to her head the previous night, but said that she did not want to do anything about it. When the police officers returned to the living room, Roy or CSO Campbell told them that Glenn had a gun. The police officer took Glenn's gun "for safekeeping". Glenn left the house, but returned briefly to give Roy his house key.

Roy alleges that Officer Campbell knew, when Glenn returned to the house, that he assaulted Roy with a weapon the previous night. Officer Campbell recalled that Roy did not tell him of Glenn's conduct and threats to kill her until after Glenn left the house the second time. The police placed Glenn's gun in the police property room and referred the case to the prosecutor's office.

On January 12, 1984, police called Roy about the assault. Roy was not at home, so they left a message for her. On January 16, 1984, the Victim Assistance Unit of the prosecutor's office sent Roy a letter, notifying her that the prosecutor would be filing charges in her case and asking that Roy contact the prosecutor's office and the Victim Assistance Unit about the case. While the case was pending, on January 18, police returned Glenn's gun to him. On January 24, the prosecutor's office sent a second letter to Roy, asking that she contact their office. The Victim Assistance Unit notified the assistant prosecutor on February 24 that it could not reach Roy. On April 12, 1984, the prosecutor notified the Everett Police Department, specifically Officers Campbell and McDonald, that he could not press charges unless the witness cooperated and that he could not reach Roy. The prosecutor also asked for a witness statement. On July 15, 1984, Glenn threatened Roy and would not let her leave her apartment. Police went to Roy's home and impounded Glenn's weapon for safekeeping. They returned the weapon to Glenn approximately 6 weeks later, on September 4.

On September 22, 1984, Glenn struck Roy and threw her to the ground. Officers arrested Glenn and charged him with domestic violence assault. Roy obtained a temporary protective order on September 24, which directed Glenn to "keep away from [Roy's] residence or from any other place where the petitioner may be." The temporary order prohibited Glenn from interfering with Roy's custody of her children. The order was effective until October 4, 1984. Officer Pyles served the protective order on Glenn the evening of September 24.

On September 26, Roy walked to a baby-sitter's house, to pick up her children. The baby-sitter lived "down the street" from Roy. As Roy approached the house, Glenn drove up and parked his car in the baby-sitter's driveway, obstructing Roy's path. Glenn asked Roy to get in the car so he could talk to her. He threatened to kill Roy and her children if Roy pressed charges against him. Roy's neighbor appeared and Glenn left.

Roy reported this incident to Detective Hegge. Hegge told Roy he could not do anything because Glenn did not violate the protective order. The parties agree that Hegge did not act because he believed the protective order extended only to Roy's residence and not to the public sidewalk in front of the neighbor's residence.

Glenn came to Roy's home at approximately 5:30 a.m. on September 27, and threatened to kill her if she did not meet him at a motel. Roy reported the incident 6 hours later, at 11:20 a.m. Police responded to Roy's call, found Glenn at the motel, and arrested him for violating the temporary protective order.

Roy obtained a second protective order on October 4, 1984. The order gave Glenn visitation rights with the parties' child on the third weekend of each month only. It directed Glenn to "keep away from Roy's residence . . . or from any other place where the petitioner may be except to carry out his visitation rights." The restraining order was effective for 1 year, from October 4, 1984, to October 4, 1985. Glenn received a copy of this order at the hearing.

On October 5, 1984, Glenn broke into Roy's apartment and, as described above, shot at Roy and killed himself.

In May 1985, Roy filed a complaint for damages against the City, the police department, the Chief of Police, several police officers, the prosecutor's office, and Glenn's estate. The defendants moved for summary judgment because they alleged that they were immune from suit under RCW 10.99.070. The court denied the motion for summary judgment. It ruled, in part, that:

> Defendant City and police officers' immunity under RCW 10.99.070, construed in light of the entire Domestic Violence Act, is limited to conduct in the course of an arrest or other on-the-scene action such as entering a home to break up a fight. Since Plaintiff Roy's suit is not based on such conduct, it is not barred by the immunity section of the domestic violence law, and therefore defendant's motion on that issue is denied.

The court also rejected the defendants' claim that qualified immunity precluded their liability for Roy's claims because "[m]aterial issues of fact exist as to whether defendants' conduct was objectively reasonable . . .." Finally, the court dismissed Roy's claims that the defendants exhibited a "pattern of indifference" that constituted a violation of equal protection.

This court granted discretionary review of the trial court's order on June 5, 1990.

### SUMMARY JUDGMENT STANDARD

The defendants appeal from the trial court order denying summary judgment in their favor. Reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *Atherton Condominium Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 515, 799 P.2d 250 (1990). Summary judgment is appropriate if there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. *Atherton Condominium Ass'n*, 115 Wn.2d at 516; CR 56(c). Generally, summary judgment is not appropriate where "good faith" is an issue. *Dickinson v. Edwards*, 105 Wn.2d 457, 461, 716 P.2d 814 (1986); *Gwinn v. Church of the Nazarene*, 66 Wn.2d 838,

846, 405 P.2d 602 (1965); *Preston v. Duncan*, 55 Wn.2d 678, 681-82, 349 P.2d 605 (1960). A bare assertion or conclusory allegation that a party acted in bad faith, however, alone, does not raise a question of fact. *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 389-90, 715 P.2d 1133 (1986); *Ruffer v. St. Frances Cabrini Hosp.*, 56 Wn. App. 625, 784 P.2d 1288, *review denied*, 114 Wn.2d 1023 (1990). Further, "good faith" does not demand infallible judgment: on the contrary, it encompasses honest and reasonable mistakes. *Guffey v. State*, 103 Wn.2d 144, 151, 690 P.2d 1163 (1984). If, after reviewing the concrete evidence presented, reasonable minds could reach but one conclusion, then a question of fact, like good faith, may be determined as a matter of law. See *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 352, 779 P.2d 697 (1989).

ANALYSIS

The parties dispute the scope of immunity that RCW 10.99.070 grants. The statute provides that:

> A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission in good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident.

The majority correctly states that the question presented is one of statutory interpretation. Interpretation of a statute is a question of law and our review is de novo. *Multicare Med. Ctr. v. State*, 114 Wn.2d 572, 582, 790 P.2d 124 (1990). We adopt that interpretation which best advances the legislative purpose of an act and avoids unlikely, absurd, or strained consequences. *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990); *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990).

IMMUNITY OF INDIVIDUAL OFFICERS

*The domestic violence act immunizes peace officers for their acts or omissions arising out of incidents of domestic violence, qualified only by the requirement that the officers act in good faith.*

The defendants argue that the plain language of the phrase "any other action or omission" creates a "general and unqualified grant of immunity." Brief of Petitioners, at 13. I agree with the majority that RCW 10.99.070 does not create a blanket grant of immunity. The statutory terms "any" and "omission" derive meaning from the context in which they are employed. These statutory terms should not be interpreted in a piecemeal fashion, particularly where such a distorted interpretation defeats the clearly expressed intent of the Legislature. *See Johnson v. Department of Empl. Sec.*, 112 Wn.2d 172, 177-78, 769 P.2d 305 (1989); *Mercer Island v. Kaltenbach*, 60 Wn.2d 105, 109, 371 P.2d 1009 (1962). The Legislature's purpose when it enacted the domestic violence act was "to assure the victim of domestic violence the maximum protection from abuse which the law . . . can provide . . . [to] stress the enforcement of the laws to protect the victim and . . . communicate the attitude that violent behavior is not excused or tolerated . . ." simply because it occurs between cohabitants. RCW 10.99.010. *See State v. Raines*, 55 Wn. App. 459, 465-66, 778 P.2d 538, *review denied*, 113 Wn.2d 1036 (1990). The comprehensive immunity that defendants advocate vitiates the clear duty that the act imposes on peace officers to enforce the law and offer victims of abuse maximum protection under the law. *State v. Raines, supra*. I believe that the defendants' interpretation of RCW 10.99.070 may encourage precisely the "differing treatment of crimes occurring between cohabitants and of the same crimes occurring between strangers" which the Legislature condemned when it passed the domestic violence act. I therefore agree with the majority and reject the defendants' unqualified interpretation of the immunity provision of RCW 10.99.

The majority correctly rejects defendants' assertion that RCW 10.99.070 offers unqualified immunity to peace officers. It then adopts an interpretation, however, that flagrantly disregards the language of the act and conflicts with the tenor of other decisions of this court concerning peace officer immunity. The majority amends the language

of the immunity provision when it disregards the key word "omission" and the phrase "in good faith".

Viewing the statute as a whole and considering the legislative intent that underlies the act, RCW 10.99.070 clearly grants qualified immunity to peace officers for conduct arising out of incidents of domestic violence. The statute immunizes an "action or *omission in good faith*" arising out of an incident of domestic violence. The court must give effect to every word and clause of the statute, and may not deem a word or clause inoperative or superfluous unless it is the result of obvious mistake or error. *Dennis v. Department of Labor & Indus.*, 109 Wn.2d 467, 479-80, 745 P.2d 1295 (1987); *Cox v. Helenius*, 103 Wn.2d 383, 387-88, 693 P.2d 683 (1985). I therefore would give effect to the word "omission" as well as the clause "in good faith", because there is no evidence that inclusion of the word or phrase is the result of obvious mistake by the Legislature.

The word "omission" expands the scope of immunity, to include more than "an arrest or other on-the-scene action". Conversely, the phrase "in good faith" clearly limits the scope of immunity that the Legislature accords to peace officers under the domestic violence act. The scope of immunity includes actions or omissions of peace officers only if their conduct arises from an alleged incident of domestic violence and only if it is performed in good faith, pursuant to the act.

The conclusion that RCW 10.99.070 extends qualified, "good faith" immunity to peace officers accords with the legislative purpose that underlies the domestic violence act. The purpose of the act is to "recognize the importance of domestic violence as a serious crime against society . . . to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide . . . [and to ensure] that criminal laws [are] enforced without regard to whether the persons involved are or were married, cohabiting, or involved in a relationship." RCW 10.99.010. The Legislature, when it passed the act, recognized the strong public interest in preventing

domestic abuse, as evidenced both by the explicit language of the statutory declaration of purpose and by the statutory provision which *requires* that an officer "exercise arrest powers" when he responds to a domestic violence call and has probable cause to believe a crime has been committed. RCW 10.99.030; *cf. State v. Steinke*, 88 Or. App. 626, 629, 746 P.2d 758, 760 (1987). Qualified "good faith" immunity best advances the purposes of the act because it effectively balances the interests of the victims of domestic violence, who are entitled to maximum police protection, and the interest of peace officers who must prevent crime and rapidly make decisions concerning the alleged victims and perpetrators of crimes, often in perilous circumstances. See *Report of House Committee on Social and Health Services* (Feb. 14, 1979); H. Rep. No. 438 (Feb. 20, 1979).

The extension of qualified good faith immunity to peace officers acting pursuant to the domestic violence act also accords with the position taken by this court in *Guffey v. State*, 103 Wn.2d 144, 150-51, 690 P.2d 1163 (1984). In *Guffey*, state troopers stopped the Guffeys' car during a "spot check". A radio check on Mr. Guffey led the officers to believe that authorities wanted Guffey on an outstanding felony warrant. *Guffey v. State, supra* at 145. One of the officers approached Guffey's car with gun drawn, ordered Guffey from the car, and patted him down. *Guffey v. State, supra* at 146. The officer did not find a weapon, Guffey explained that the warrant was for his brother, and the troopers let Guffey leave. *Guffey v. State, supra.*

The Guffeys sued the State, the State Patrol, and individual state troopers for outrage, false arrest, and false imprisonment. The court held that:

> [A]n officer has a qualified immunity from liability for false arrest and imprisonment when the officer (1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably.

*Guffey v. State, supra* at 152.

The court in *Guffey* adopted a qualified privilege for officers, which was limited by the requirements that the

officer carry out a duty, according to procedure and in a reasonable fashion. The immunity at issue here, like the immunity in *Guffey*, is limited. It requires that an officer (1) make an arrest based on probable cause, enforce a court order, or commit some other action or omission; (2) pursuant to the act; and that he (3) act in good faith. *Guffey*, and the cases which follow it, further support our holding that RCW 10.99.070 extends qualified "good faith" immunity to police officers. *Guffey v. State, supra; see also Spurrell v. Bloch*, 40 Wn. App. 854, 869, 701 P.2d 529, *review denied*, 104 Wn.2d 1014 (1985).

The majority's treatment of *Guffey* scrupulously overlooks the significance of the reasoning in and holding of that case. Furthermore, its conclusion that *Guffey* still applies to "police conduct in situations which do not involve domestic violence", majority at 359, but that more limited immunity applies to police conduct in situations involving domestic violence is illogical and inconsistent. No rule of law or principle supports the conclusion that peace officers owe a *greater* duty of protection or more rigorous law enforcement to victims of domestic violence than to other citizen victims of violence. Yet that is the duty that the majority's more limited immunity imposes on peace officers in a domestic violence situation. The majority's application of *Guffey* violates the Legislature's intent that victims of domestic violence enjoy the *same* protection that other victims of violence enjoy, "without regard to whether the persons involved are . . . cohabiting . . .." RCW 10.99.010.

Finally, if the Legislature intended that RCW 10.99.070 protect only actions of peace officers, it would have so stated. The Oregon Legislature, for example, enacted an immunity provision that specifically limits the scope of immunity and shields peace officers from liability only "for making an arrest . . . in good faith", pursuant to the Oregon family abuse act. 1977 Or. Laws, ch. 845, § 9; Or. Rev. Stat. § 133.315. The immunity provision of our domestic violence

act, enacted 2 years after Oregon's law, employs broader language: It immunizes "an arrest . . . or any other action or omission in good faith". RCW 10.99.070. Our Legislature considered the precise language of the immunity provision and explicitly chose to offer immunity not just for arrests made in good faith, but for any action or omission, in good faith, arising out of an incident of domestic violence. Amendments to Proposed Substitute House Bill 438, 46th Legislature (1979), at 4, para. 18. It could have adopted a narrower standard, like that of Oregon, but it rejected more limited immunity.

Because the immunity that RCW 10.99.070 offers is qualified only by the requirement that the officer's action or omission be undertaken in good faith, I would conclude that the trial court erred when it confined the scope of immunity to "an arrest or other on the street action, such as entering a home to break up a fight". Clerk's Papers, at 17-18. Further, I believe that whether the officers in this case acted in good faith is a question which can be determined as a matter of law. Although Roy asserts that the officers "failed to meet industry standards of competence" (Brief of Respondent, at 12) when they did not arrest Glenn on January 6 and when they returned Glenn's gun to him on January 18, concrete evidence of record does not support her allegations or raise a question of material fact. Evidence shows that Officer Campbell did not learn the specifics of Glenn's assault on Roy until after Roy left the residence on January 6. Evidence also shows that Officer Rasmussen acted pursuant to police regulation when he returned Glenn's gun on January 18. There is no evidence that the officers willfully, knowingly violated police procedures in this case.

The scope of qualified good faith immunity available under RCW 10.99.070 encompasses the conduct of the officers in this case. Statutory good faith immunity shields them from liability for the actions or omissions of which Roy complains. The trial court erred when it denied summary judgment in favor of the individual police officers.

IMMUNITY OF THE MUNICIPAL EMPLOYER

*The "good faith" immunity that peace officers enjoy shields their municipal employer from liability for claims based on the officers' conduct, via the doctrine of respondeat superior.*

The defendants contend that the immunity which individual peace officers enjoy extends to the officers' municipal employer and that all claims against the employer, therefore, should be dismissed. The majority does not address this issue, because it concludes that the immunity provision of RCW 10.99.070 does not shield the individual peace officer's conduct. This court previously has held that good faith immunity of an employee may preclude an employer's liability in any civil action when the employer's liability is based solely on the doctrine of respondeat superior. In *Guffey v. State, supra,* summarized above, this court concluded that the common law, qualified immunity which shielded individual peace officers from suit extended to the municipal employer, when the liability of the employer rested on acts of the employee and was attributed to the employer via the theory of respondeat superior. *Guffey,* 103 Wn.2d at 153; *see also Spurrell v. Bloch,* 40 Wn. App. at 869-70 (police officers have qualified immunity from false imprisonment claims arising out of everyday operational acts, and a finding of employee nonliability precludes any finding that an employer is liable when liability is based solely on the doctrine of respondeat superior); *cf. Creelman v. Svenning,* 67 Wn.2d 882, 885, 410 P.2d 606 (1966) (common law prosecutorial immunity which shields judicial or quasi-judicial officers extends to municipal employer for acts of officers in the performance of duties which rest upon them). Similarly, in *Frost v. Walla Walla,* 106 Wn.2d 669, 673, 675, 724 P.2d 1017 (1986), we concluded that the immunity which the Uniform Controlled Substances Act offered "any . . . state, county, or municipal officer", RCW 69.50.506(c), also shielded the jurisdiction that employed prosecutors "for acts of [prosecutors] in the performance of [their] duties . . .." *Frost,* at 673 (quoting *Creelman,* at 885). In these cases, we reasoned that the

objective sought by immunizing individual officers, "unhampered police action, free from the hindrance created if liability could be imposed on police for their good faith, objectively reasonable actions", *Frost*, 106 Wn.2d at 673, would be defeated if individual officers were immune but their employers were not, because it would require that an officer "weigh the possibilities of precipitating . . . litigation involving [his employer] against his action in any criminal case . . .." *Creelman*, 67 Wn.2d at 885.

I find the reasoning adopted in *Guffey, Frost,* and *Creelman* persuasive here. I therefore would hold that the protection which RCW 10.99.070 offers individual police officers extends to the jurisdiction which employs the officer, for acts or omissions of the peace officers undertaken in good faith, in the performance of duties under the act. This immunity shields a municipal employer from liability for any claim where the employer's liability is based upon the doctrine of respondeat superior. In this case, the immunity of RCW 10.99.070 entirely shields the police officers from liability for Roy's claims. The protection that good faith immunity accords the individual officers also shields the municipal employer, via the doctrine of respondeat superior. The trial court therefore erred when it denied summary judgment of those claims where the municipality's liability is based on conduct of individual officers.

## MUNICIPAL EMPLOYER

*Discretionary immunity shields the municipal employer from liability for claims based on its "distinct duties under the act".*

Roy contends that even if immunity extends to the department or City for claims based on the conduct of individual officers, that immunity does not justify summary judgment of claims where the municipality is liable for conduct independent of its officers. Roy alleges that the municipal defendants are liable for their independent actions in this case, for the breach of "distinct duties" the act imposed on them but did not impose on the peace

officers. She contends that the City and department failed to "create, fund, and monitor appropriate training programs for individual officers or record keeping" systems. Brief of Respondent, at 37; Clerk's Papers, at 590 (complaint paras. 9.4, 9.5). I conclude that Roy is mistaken: discretionary immunity shields the City and department from liability for their alleged failure to "create, fund, and monitor" appropriate educational and record-keeping programs.

When it enacted RCW 4.92.090, the Legislature abolished the doctrine of sovereign immunity and rendered the State liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation. *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 252, 407 P.2d 440 (1965). The statute does not, however, render the State liable for every governmental action or make the State a surety for every governmental enterprise. *Evangelical United Brethren Church v. State, supra* at 253. Government conduct at an executive or administrative level, which involves basic policy decisionmaking and implementation, falls within the scope of immunity and cannot be tortious. *Evangelical United Brethren Church v. State, supra* at 253-54.

The purpose of discretionary immunity is to ensure "room for basic governmental policy decision and the implementation thereof, unhampered by the threat . . . of . . . tort liability". *Evangelical United Brethren Church v. State, supra* at 254. We apply a 4-part test when determining whether an act falls within the scope of discretionary immunity:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or law-

ful authority and duty to do or make the challenged act, omission, or decision?

*Evangelical United Brethren Church v. State, supra* at 255. The discretionary act must involve a basic policy determination and be the product of a considered policy decision. *Chambers-Castanes v. King Cy.*, 100 Wn.2d 275, 282, 669 P.2d 451, 39 A.L.R.4th 671 (1983). Whether discretionary immunity extends to particular governmental conduct generally is a question of law. *Evangelical United Brethren Church v. State*, 67 Wn.2d at 253.

We have, in several cases, addressed whether counties, cities, and police departments are entitled to discretionary immunity. In *Chambers-Castanes*, at 282, we concluded that the "simple decision whether to dispatch an officer to the scene of a crime or to investigate a crime" did not involve basic policy decisions and was not entitled to immunity. In *Mason v. Bitton*, 85 Wn.2d 321, 328, 534 P.2d 1360 (1975), we concluded that the decision to chase or not to chase an individual does not fall within the scope of immunity. Similarly, we did not believe that the decision to release information about a police investigation to the press was an executive or administrative decision that warranted immunity. *Chambers-Castanes*, 100 Wn.2d at 283; *Bender v. Seattle*, 99 Wn.2d 582, 589-90, 664 P.2d 492 (1983). In all these cases we deemed the discretionary conduct "operational" or "ministerial".

Roy's claim that the City and police department did not create, fund, or monitor "appropriate" training programs and record-keeping systems, however, is qualitatively different from the conduct discussed in *Chambers-Castanes*, *Bender*, or *Mason*. A governmental agency's decision to "create, fund, and monitor" programs or a record-keeping system, pursuant to the domestic violence act, clearly falls within the scope of discretionary immunity. First, it is a policy of this State to change the attitudes and practices of law enforcement agencies, so that these agencies recognize that domestic violence is not tolerable and they enforce the

law against persons who commit acts of domestic violence. Secondly, the creation, funding, and monitoring of programs that "appropriately" educate peace officers and generate records that render enforcement more effective are essential to the realization of these policy goals. Third, the allocation of funds for, and the development of, "appropriate" departmental educational programs and record-keeping systems involves the exercise of fiscal, educational, and organizational judgment and expertise. Fourth, the domestic violence act authorizes the City and the department to fund, create, and monitor "appropriate" educational programs and the record-keeping system required to achieve the purposes of the act. The City of Everett and the police department are immune from liability for the alleged failure to "create, fund, and monitor appropriate training programs . . . and [an] appropriate record keeping" system because their conduct involved basic policy and was the product of considered policy. Brief of Respondent, at 37. I believe that the trial court should have granted summary judgment in defendants' favor of Roy's claims that the City and department did not properly create, fund, or monitor educational and record-keeping programs, as set forth in Roy's fifth cause of action.

Roy further contends that the department, or its individual agents, did not conduct an investigation and send the additional information that the prosecutor's office requested on April 12, 1988. She also alleges that the department or its agents negligently returned Glenn's gun to him, although Glenn did not have a permit for the weapon and the investigation of the January assault was pending. These allegations, however, are allegations of individual negligence and misconduct, *viz.*, that Officers Rasmussen and Stewart negligently returned Glenn's gun and Officers McDonald and Campbell did not further investigate and send the additional information that the prosecutor requested. These acts of alleged negligence by individual officers fall within the scope of immunity that RCW

10.99.070 extends because they are actions or omissions, by peace officers, arising out of an incident of domestic violence, and Roy does not contend that the officers acted in bad faith.

In summary, I would hold that discretionary immunity shields the City and department from liability for their alleged failure to fund, create, and monitor appropriate training programs for officers, as set out in Roy's fifth cause of action. I would also hold that the qualified immunity of RCW 10.99.070 shields particular officers for the individual conduct of which Roy complains, because she does not allege, nor does the record reflect, that the officers acted in bad faith.

CONSTITUTIONAL CHALLENGES TO RCW 10.99.070

Roy and the amici allege that any interpretation of RCW 10.99.070 which is broader than the trial court's, such as the interpretation I advance, violates article 1, section 12 of the state constitution, the fourteenth amendment to the federal constitution, and the Equal Rights Amendment, Const. art. 31, § 1. Article 1, section 12 provides that:

> No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

The purpose of the article is to:

> secure equality of treatment to all persons without undue favor . . . or hostile discrimination . . .. Compliance with this . . . purpose requires that the legislation under examination apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within and those without a designated class.

*Faxe v. Grandview*, 48 Wn.2d 342, 348, 294 P.2d 402 (1956). The fourteenth amendment to the United States Constitution provides that no state:

> shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws.

The privileges and immunities clause of the Washington State Constitution and the equal protection clause of the Fourteenth Amendment are substantially identical and have been considered by this court as one equal protection issue. *American Network, Inc. v. Utilities & Transp. Comm'n*, 113 Wn.2d 59, 77, 776 P.2d 950 (1989); *Hanson v. Hutt*, 83 Wn.2d 195, 200-01, 517 P.2d 599 (1973).

At the outset of an equal protection analysis under article 1, section 12 and the Fourteenth Amendment, the court defines the standard of review against which to test the challenged legislation. *State v. Rice*, 98 Wn.2d 384, 399, 655 P.2d 1145 (1982). Two tests are used to judicially measure classifications alleged to violate equal protection: the strict scrutiny and the rational relationship tests. *State v. Rice, supra.* In either case, a statute that is facially neutral, but allegedly results in an unequal application of the law, does not violate the equal protection guaranties of the state or federal constitution unless the party challenging the statute shows an element of intentional or purposeful discrimination. *Macias v. Department of Labor & Indus.*, 100 Wn.2d 263, 269-70, 668 P.2d 1278 (1983); *State v. Nixon*, 10 Wn. App. 355, 358, 517 P.2d 212 (1973), *review denied*, 83 Wn.2d 1014 (1974).

Roy and the amici concede that RCW 10.99.070 is facially neutral, but they contend that a broad interpretation of the immunity provision violates equal protection under the state and federal constitutions because the majority of the victims of domestic abuse are women. Roy reasons that because the majority of the victims are women a broad grant of immunity effectively will have a discriminatory impact on women: it will deny women access to the court and grant peace officers immunity from liability for tortious conduct against women.

This equal protection argument is flawed for several reasons. Even assuming the accuracy of all of the statistical evidence that Roy and the amici submitted, "statistics alone will not trigger strict scrutiny . . .." *Macias*, 100 Wn.2d at 270. Roy must show discriminatory intent or purpose.

*Macias v. Department of Labor & Indus., supra; State v. Nixon*, 10 Wn. App. at 358. There is no evidence that discriminatory intent or purpose motivated the City's broad interpretation of the immunity provision. *But see Hynson v. Chester*, 731 F. Supp. 1236, 1240 (E.D. Pa. 1990).

The cases upon which Roy relies do not compel a different result. Neither gender discrimination nor equal protection was at issue in *Chambers-Castanes v. King Cy.*, 100 Wn.2d 275, 669 P.2d 451, 39 A.L.R.4th 671 (1983). *Jenkins v. State*, 85 Wn.2d 883, 540 P.2d 1363 (1975) did not involve an expressly granted statutory immunity, a gender based statutory classification, or a facially neutral statute that allegedly had a discriminatory impact on women. Further, the statute in *Jenkins* denied a class of tort victims any access to the court, while the immunity that RCW 10.99.070 extends to peace officers leaves the courts open to claims which allege that an officer's actions or omissions were performed in bad faith. Finally, the court in *Darrin v. Gould*, 85 Wn.2d 859, 540 P.2d 882 (1975) did not address a question of statutory immunity that shielded municipal employees or employers, and the plaintiffs in *Darrin* challenged facially discriminatory regulations, not a facially neutral statute.[1]

Roy and the amici do not demonstrate that an interpretation of RCW 10.99.070 which offers peace officers qualified good faith immunity violates article 1, section 12 of the state constitution or the fourteenth amendment to the United States Constitution.

---

[1]The amici also contend that any interpretation of RCW 10.99.070 broader than the trial court's violates equal protection because it deprives women of a substantial property right: the right to be indemnified for personal injuries. *Hanson v. Hutt*, 83 Wn.2d 195, 517 P.2d 599 (1973); *Hunter v. North Mason High Sch. & Sch. Dist. 403*, 85 Wn.2d 810, 539 P.2d 845 (1975). Because Roy's equal protection claim fails on the ground that she does not show discriminatory purpose or intent, I would not address this argument. Suffice it to say that the cases upon which the amici rely are factually and legally distinguishable from the case before us and do not support a claim that an interpretation of RCW 10.99.070 broader than the trial court's violates constitutional guaranties of equal protection under a rational relationship test.

Roy and the amici next contend that an interpretation of RCW 10.99.070 broader than the trial court's violates article 31, section 1 of the state constitution because, although the immunity provision itself is facially neutral, a broad reading of the statutory language will disparately impact female victims of abuse and perpetuate discriminatory practices. Brief of Respondent, at 41-42; Brief of Amici Curiae, at 13-16. Their arguments and the cases upon which they rely, however, are not persuasive.

Article 31, the Equal Rights Amendment, provides that:

Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.

The ERA's protection goes beyond that of the equal protection clause of the federal constitution and the privileges and immunities clause of the state constitution. *State v. Brayman*, 110 Wn.2d 183, 200-01, 751 P.2d 294 (1988); *Darrin*, 85 Wn.2d at 871. The ERA forbids discrimination against or special treatment of any person on account of their sex. *Darrin v. Gould, supra; Blair v. WSU*, 108 Wn.2d 558, 565, 740 P.2d 1379 (1987); *Marchioro v. Chaney*, 90 Wn.2d 298, 305, 582 P.2d 487 (1978). Article 31 does not employ the tiered scrutiny or classification analysis of the Fourteenth Amendment and Const. art. 1. *Marchioro*, 90 Wn.2d at 305. Instead, the single criterion is whether the classification is "by sex discriminatory? or . . . [whether] equality [has] been denied or abridged on account of sex?" *Marchioro v. Chaney, supra*. If equality is restricted on the basis of sex, the classification is discriminatory. *State v. Brayman*, 110 Wn.2d at 201.

In *State v. Brayman*, 110 Wn.2d at 183, 200, the plaintiffs alleged that three facially neutral statutory amendments which defined driving while intoxicated violated the ERA. Plaintiffs argued that the amendments discriminated against women because the breath/blood ratio used to determine intoxication under the statute was based on studies of mostly male subjects, and women generally have lower blood/breath ratios and smaller average lung capacity

than men, which would lead to higher breath-alcohol readings among women. *State v. Brayman, supra* at 202-03. This court rejected the plaintiffs' claim because:

> Although the record demonstrates that breath alcohol levels may not accurately represent blood alcohol levels in particular individuals, this evidence alone does not establish that the breath alcohol standard falls more harshly on women as a class. Respondents bear the burden of showing that the Legislature's decision to use a breath alcohol standard to prove impairment falls more harshly on women. Here, no studies have been made of the differences in blood-breath ratios between men and women. At best the record shows that the [standard used] may have a hypothetical disparate impact on women.

*Brayman*, at 203-04. In this case, as in *Brayman*, the statistics presented and the arguments based on those statistics show only a hypothetical disparate impact on women, insufficient to establish a violation of the ERA. Compare *Hynson v. Chester*, 731 F. Supp. at 1240-41. Roy and the amici do not establish that a broader interpretation of RCW 10.99.070 than that adopted by the trial court violates the Equal Rights Amendment of the Washington Constitution.

### Summary

The domestic violence act offers peace officers qualified "good faith" immunity not just for arrests, but for any other actions or omissions performed in good faith. A thorough review of the record in this case reveals that the peace officers responded promptly on every occasion when Roy reported an incident of domestic violence. Roy does not allege that the peace officers acted in bad faith, nor is there evidence that they did so. The majority acknowledges that Roy refused to file statements or take other action necessary for the City to pursue her case. Roy's failure to participate, for whatever reason, cannot be construed as "bad faith" failure to protect by the peace officers. Because there is no evidence that the peace officers acted in bad faith, RCW 10.99.070 shields the individual officers and their municipal employer from liability for Roy's claims and summary judgment should have been granted in the City's

favor. Similarly, discretionary immunity precludes Roy's claims based on the City's "distinct duties under the act, to create, fund, and monitor" appropriate training and record-keeping programs. Brief of Respondent, at 37.

CONCLUSION

In summary, I would hold that:

1. RCW 10.99.070 immunizes police officers from liability for any action or failure to act arising out of an incident of domestic violence, so long as the officers act in good faith.

2. As a matter of law, good faith immunity completely shields the peace officers in this case from liability. Roy does not even raise an inference that they acted in bad faith.

Roy impeded the officers from protecting her, by her refusal to file charges with the prosecutor and city attorney. Without a charge, police had to return Glenn's gun, which Roy complains that the police should not have done.

3. Good faith immunity also shields their municipal employer from liability for claims based on peace officers' conduct.

4. Discretionary immunity precludes the department or City from being independently liable for their alleged failure to fund, create, and monitor appropriate educational programs for its peace officers. I would reverse the trial court's order denying summary judgment of Roy's claims, as set forth in her fifth cause of action, and dismiss those claims.

5. An interpretation of RCW 10.99.070 which extends good faith immunity to peace officers does not violate article 1 or 31 of the state constitution or the fourteenth amendment to the federal constitution.

Reconsideration denied March 17, 1992.