[Nos. 25602-5-I; 26055-3-I. Division One. May 18, 1992.]

LA VERN DONALDSON, as *Administratrix, Respondent,* v. THE CITY OF SEATTLE, *Appellant.*

*Stephen P. Larson,* for appellant.

*Lembhard G. Howell,* for respondent.

*William J. Barker, Tacoma City Attorney,* and *Kathryn B. Gerhardt, Assistant,* amicus curiae for appellant.

*Christine Lamson* on behalf of Northwest Women's Law Center, amicus curiae for respondent.

FORREST, J. — The City of Seattle (City) appeals a judgment finding police negligence caused the death of Leola Washington, claiming: (1) the public duty doctrine bars liability, (2) the death was not proximately caused by the City's acts, and (3) the City is immune to liability.[1] We agree in part and reverse.

Leola Washington had a long history of drug abuse and failed drug treatment. During her life she had several rela-

---

[1] Since argument in this case the Supreme Court has resolved this issue adversely to the City in *Roy v. Everett,* 118 Wn.2d 352, 359, 823 P.2d 1084 (1992). The court held "An interpretation of RCW 10.99.070 that protects law enforcement agencies which fail to enforce the laws defeats the stated purpose of the statute as a whole."

tionships in which she was physically abused. In 1982 Leola was introduced to Steven Barnes. Both Barnes and Leola were seriously addicted to drugs, which created continuous pressure on their personal, financial and employment relationships. Barnes's assaultive behavior toward Leola began early in their relationship.

In January 1983 Leola was so badly beaten she was taken to Harborview Medical Center. Although the medical personnel suspected domestic violence, Leola refused to discuss the situation. In January 1985 the police were dispatched to Leola's and Barnes's residence. The police could see that Leola was injured and found Barnes upstairs. In spite of Leola's protestations, Barnes was arrested and Leola was given a domestic violence information sheet.[2]

While Leola was in drug treatment in March 1985 she met another patient, Kenny Williams. Barnes was also in treatment in another center. In May of 1985 Barnes returned to the home he shared with Leola to find Kenny Williams' clothing. Outraged, Barnes tore up the house. Leola called the police and Barnes was arrested and jailed on charges of malicious mischief. On May 29, 1985, Leola filed for a temporary order of protection against Barnes.[3] The order was granted but never entered into the Washington Criminal Information System. On August 30, 1985, Barnes was sentenced for malicious mischief, and was ordered to pay restitution and have no contact with Leola. Again, the no-contact portion of the sentence was not entered on the state information system.[4]

Barnes and Leola continued contacts following this incident, even though it was in violation of the no-contact order. On September 11, 1985, the two got together and spent that

---

[2] *See* RCW 10.99.030(4).

[3] It is unclear from the record whether this order was separate from the malicious mischief prosecution or whether she sought the order pursuant to the civil remedy found in RCW 26.50.

[4] *See* RCW 10.99.050(1), (3).

evening and the next morning taking drugs. On September 12 Leola loaned Barnes her mother's car. Later that day he robbed a Value Village store. The police traced the license number of the car seen at Value Village to Leola and a witness to the robbery saw the car parked at Leola's. One of the officers who arrived at Leola's home to investigate the robbery had also answered the January 1985 domestic violence call and questioned Leola about Barnes's possible involvement in the robbery. Apparently Leola did not cooperate in the investigation and hid Barnes from the police. Barnes was not arrested for this robbery.

In December 1985 Barnes and Leola were together again and heavily involved with drugs. On Thursday, December 12, 1985, Barnes received a $1,800 settlement in a lawsuit. Leola and Barnes spent the money on drugs and spent the night together. On Saturday morning, December 14, Leola went to see Barnes at his mother's home. While there the two argued. They returned to Leola's house, where they continued to argue. Barnes pushed Leola to the couch, started to unbutton her pants and said he intended to "make love" to her. She told him it was not a good time since their son was still out in the car. Barnes then released Leola, she got up and went out of the house screaming. Leola ran to the neighbor's house; Barnes followed, allegedly saying "I'm going to kill you for ruining my life." Barnes then left the area.

Leola called the police. Officers Burrows and Baker answered the call. Baker got a description of Barnes and began an area search. Burrows took a statement from Leola. Leola informed Burrows of the no-contact order, but a radio check by Burrows revealed no order on the computer. Leola was unable to provide Burrows with a copy of the order. Leola gave Burrows Barnes's mother's address but told Burrows Barnes would not likely go there. Burrows also completed an area search and returned to Leola's home. Informing Leola that Barnes could not be found, Burrows offered to take her to a shelter or to a family member. Leola declined the offer.

Kenny Williams spent Saturday night with Leola at her home. The next morning, Sunday, December 15, 1985, Leola, Williams and Leola's brother, were moving Leola to her mother's home. Immediately after Williams and Leola's brother left the house Barnes entered the home and stabbed Leola to death. Barnes was subsequently arrested and convicted of first degree murder.

La Vern Donaldson, administratrix of Leola's estate, brought a wrongful death action against the State, Barnes's probation officer, and the City of Seattle. The State and the probation officer were granted summary judgment on the basis of immunity. The court denied the City's motion for summary judgment. A 3-week jury trial began on November 20, 1989. At the close of plaintiff's case and the conclusion of the trial the City moved to dismiss the claims. The court denied the motions, holding there was sufficient evidence the City owed Leola a statutory duty. The jury was instructed on the statutory duty to arrest and that violation of a statute is negligence per se. The jury returned a verdict in favor of the plaintiff, less 35 percent comparative negligence. The court denied posttrial motions for judgment notwithstanding the verdict and a new trial.

## PUBLIC DUTY DOCTRINE

■ In all negligence actions the plaintiff must prove the defendant owed the plaintiff a duty of care. "Whether the defendant is a governmental entity or a private person, to be actionable, the duty must be one owed to the injured plaintiff, and not one owed to the public in general." *Taylor v. Stevens Cy.*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). When the defendant is a public official this negligence principle is called the "public duty doctrine". Generally, no liability will attach for a public official's negligent conduct unless the plaintiff can show that the duty was owed to her rather than to the general public.[5]

It is well established that a statute which creates a governmental duty to protect particular individuals can be

---

[5] *Taylor*, at 163.

the basis for a negligence action where the statute is violated and the injured party was one of the persons designed to be protected.[6] If the legislation evidences a clear intent to identify a particular and circumscribed class of persons, such persons may bring an action in tort for violation of the statute.[7]

■ The Domestic Violence Prevention Act (DVPA), amending RCW 10.99,[8] imposes a duty on the City to protect victims of domestic violence. This conclusion is supported by the statement of intent in RCW 10.99.010 which reads in pertinent part:

> The purpose of this chapter is to recognize the importance of domestic violence as a serious crime against society and *to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide.* The legislature finds that the existing criminal statutes are adequate to provide protection for victims of domestic violence. However, previous societal attitudes have been reflected in policies and practices of law enforcement agencies and prosecutors which have resulted in differing treatment of crimes occurring between cohabitants and of the same crimes occurring between strangers. . . . *It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim* and shall communicate the attitude that violent behavior is not excused or tolerated.

(Italics ours.)

This statute does not create new laws prohibiting domestic violence, but requires the police and other law enforcement bodies to better enforce the current laws in order to protect the victims of domestic violence.[9] The law identifies the particular class of individuals to be protected and defines

---

[6]*Baerlein v. State*, 92 Wn.2d 229, 232, 595 P.2d 930 (1979).

[7]*See Taylor,* at 164; *Bailey v. Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987); *Baerlein,* at 232; *Halvorson v. Dahl*, 89 Wn.2d 673, 676, 574 P.2d 1190 (1978).

[8]Laws of 1984, ch. 263.

[9]*Roy v. Everett*, 118 Wn.2d 352, 358, 823 P.2d 1084 (1992).

the specific duties of the police in this regard.[10] The City's claim that the public duty doctrine bars any liability is accordingly rejected.

### PROXIMATE CAUSE

■ Proximate cause requires proof that the defendant's breach was both the "cause in fact" and "legal cause" of the plaintiff's injury.[11] On appeal the City argues that even if arrested, Barnes would have been promptly released and able to commit the crime. The record contains scant evidence to support this theory and, ironically, what little evidence is present came through cross examination of the plaintiff's expert witness. Barnes returned to murder Leola within 24 hours after the police response to her call. In view of the evidence presented we find cause in fact to be a jury issue.[12]

■ Legal causation is intertwined with the question of duty, determining whether liability should attach even in the face of causation in fact.[13] As the court stated in *Hartley v. State*, 103 Wn.2d 768, 781, 698 P.2d 77 (1985):

> Thus, it may be immaterial whether we analyze the County's and State's liability on the basis of duty or legal causation. Policy considerations and common sense dictate whether the connection of the County and State with the collision is too remote or insubstantial to impose liability.

---

[10]While not specifically addressed by the court, one may infer from the decision in *Roy* that the Supreme Court agrees with this holding.

[11]*Christen v. Lee*, 113 Wn.2d 479, 507, 780 P.2d 1307 (1989).

[12]Whether the City believed testimony as to a possible release would have been unfavorable or whether, for practical reasons, the City merely decided not to offer such evidence is unclear. The fact remains that the City neither sought an instruction from the trial court unequivocally placing the burden on Donaldson to establish the likelihood of release nor attempted to establish it by its own evidence. A jury decision should be overturned only if there is no competent evidence or reasonable inference that would sustain the verdict. *Douglas v. Freeman*, 117 Wn.2d 242, 814 P.2d 1160 (1991).

[13]*See Hartley v. State*, 103 Wn.2d 768, 698 P.2d 77 (1985).

In support of this conclusion the court relied on Prosser among others.[14] In this case we find it conceptually clearer to analyze the City's liability for its failure to arrest in terms of duty rather than "proximate causation".

### DUTY TO ARREST FOR ASSAULT

The statutory provisions applicable to this appeal read as follows:

> (2) The primary duty of peace officers, when responding to a domestic violence situation, is to enforce the laws allegedly violated and to protect the complaining party.
>
> (3)(a) When a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer *shall* exercise arrest powers with reference to the criteria in RCW 10.31.100.

(Italics ours.) RCW 10.99.030, in part.

> (2) A police officer *shall* arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant when the officer has probable cause to believe that:
>
> . . . .
>
> (b) The person is eighteen years or older and within the preceding four hours has assaulted that person's spouse, former spouse, or a person eighteen years or older with whom the person resides or has formerly resided and the officer believes: (i) A felonious assault has occurred; (ii) an assault has occurred which has resulted in bodily injury to the victim, whether the injury is observable by the responding officer or not; or (iii) that any physical action has occurred which was intended to cause another person reasonably to fear imminent serious bodily injury or death. Bodily injury means physical pain, illness, or an impairment of physical condition.

(Italics ours.) RCW 10.31.100, in part.

---

[14]"Similarly, 'duty' and 'legal causation' are intertwined and linked to policy considerations:

" 'It is quite possible, and often helpful, to state every question which arises in connection with "proximate cause" [legal causation] in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur? Such a form of statement does not, of course, provide any answer to the question, or solve anything whatever; but it does serve to direct attention to the policy issues which determine the extent of the original obligation and of its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact.' *Hartley*, at 779-80 (quoting W. Prosser, *Torts* 244-45 (4th ed. 1971))."

 Generally, where an officer has legal grounds to make an arrest he has considerable discretion to do so. In regard to domestic violence, the rule is the reverse. If the officer has legal grounds to arrest pursuant to the statute, he has a mandatory duty to make the arrest. RCW 10.31; RCW 10.99.

The plaintiff's expert, Van Blaricum, was permitted to testify that in his opinion the officer had reasonable grounds to believe that a felony had been committed and accordingly a mandatory duty to arrest under RCW 10.31.100(2)(b)(i).[15] However, taking the facts known to the officers, together with the reasonable inferences therefrom, we hold as a matter of law there was no adequate basis for the officer to believe that a felonious assault had occurred under RCW 10.31.100-(2)(b)(i). As the City points out, at most there was an attempt at third degree rape and such an attempt is a misdemeanor and not a felony.[16] It is conceded that there is no ground for arrest under RCW 10.31.100(2)(b)(ii) since there was no bodily injury to the victim.

Based on the testimony of its expert, Professor Boerner, the City urges that even if Barnes had been present, there was no duty to arrest based on the facts known to the officers. We disagree. RCW 10.31.100(2)(b)(iii) creates a proper basis for arrest. Barnes's pushing Leola to the couch, starting to unbutton her pants, in conjunction with his threats after she tricked him into letting her leave the house, would permit a jury to find that the officer was reasonably entitled to believe that a "physical action has occurred which was intended to cause another person reasonably to fear imminent serious bodily injury or death". RCW 10.31.100(2)(b)(iii). Although the issue is close, we

---

[15] A jury cannot decide probable cause in the abstract. Indeed, whether certain facts constitute probable cause is a matter of law for the court. The jury should be instructed as to what facts an officer is entitled to reasonably believe in order to ascertain whether he has probable cause to make a given arrest for a given crime. The City failed to submit proper instructions outlining the crimes and facts necessary to constitute such crimes and did not except to the plaintiff's failure to submit such instructions. Accordingly, the error is not a basis for reversal.

[16] RCW 9A.44.060(2): "Rape in the third degree is a class C felony." RCW 9A.28-.020 mandates that an attempt to commit a class C felony is a gross misdemeanor.

find significant the broad definition of bodily injury contained in the statute, "[b]odily injury means physical pain, illness . . .". RCW 10.31.100(2)(b)(iii). Taken in conjunction with the overriding purpose of the statute to protect victims of domestic violence, we are satisfied that if Barnes had been found on the scene, the officers were not entitled to walk away but would in fact have a duty to arrest him.

## DUTY TO CONTINUE INVESTIGATION

■ While the DVPA clearly establishes a mandatory duty to arrest, this case presents a question as to what the scope of that duty is. Statutory interpretation is for the court and it is proper for the court to consider public policy in defining the scope of the duty created in the statute.[17] Donaldson argues that the existence of a mandatory duty to arrest when the abuser is on the premises also generates a mandatory duty to conduct a follow-up investigation by searching for the absent violator. She further contends that any negligence in the course of such investigation exposes the City to liability. We disagree.

■ The most important consideration is that the act does not so provide. Nowhere in the original act, nor any of the subsequent amendments, did the Legislature create a special duty to conduct follow-up investigations after the initial response where the violator is absent. Washington does not recognize the tort of negligent investigation.[18] Liability for negligent investigation would be a substantial change in the law and is certainly not required as a necessary inference from the duty to make a mandatory arrest.

There is a vast difference between a mandatory duty to arrest and a mandatory duty to conduct a follow-up investigation. In the arrest situation the officer is on the scene, the arrest is merely a matter of deciding to do so and a few minutes to physically effectuate the arrest. A mandatory duty to investigate, on the other hand, would be completely open ended as to priority, duration and intensity. Would it

---

[17]*See Taylor*, at 168.

[18]*Dever v. Fowler*, 63 Wn. App. 35, 44-45, 816 P.2d 1237, 824 P.2d 1237 (1991).

entail ignoring other calls for a domestic violence response, ignoring other reported crimes, ignoring response to a report of an injury traffic accident? How long does such duty continue? To the end of the officer's shift? Or is the department obligated to detail another officer to take over? Merely to state such obvious practical problems is to demonstrate the extraordinary difficulty that would follow in attempting to implement any such mandatory duty of investigation. Law enforcement must be vested with broad discretion to allocate limited resources among the competing demands.

It is true that in this case Donaldson complains only of a failure to go to Barnes's mother's home, but such duty must be part of a general duty applicable in other similar situations. What if Barnes's mother gave the police another address and so on ad infinitum?

The act's focus on the immediate situation and prompt removal of an abuser from the home is apparent in the 4-hour time limitation contained in RCW 10.31.100(2)(b).[19] This provision sharply curtails the mandatory duty to arrest contained in the statute. Consider the following scenario: The husband commits an assault on the wife at breakfast, the wife does not request law enforcement help at the time, the husband returns and at dinner a verbal dispute arises with no threats and no physical assault, and the wife then requests law enforcement help. By the explicit terms of RCW 10.31-.100(2)(b) the officer would have no mandatory duty to arrest because more than 4 hours had elapsed since the incident. A

---

[19]"The person is eighteen years or older and within the preceding four hours has assaulted . . .." The dissent argues that this language places a 4-hour limit from the time of the incident on the duty to investigate and try to locate an absent offender. Such an interpretation would mitigate, but not eliminate, the concerns about an open-end mandatory duty to investigate. However, in context of the statutory policy, we find the purpose to be to limit the mandatory duty to "fresh complaints". In other words, the focus is on the time between the incident and police response. The dissent's view would yield a strange result that if the incident occurs at 1 a.m. and the police arrive at 2 a.m. they have a mandatory duty to search for the absent offender for 3 hours whereas if they arrive at 4 a.m., their mandatory duty extends only for a period of 1 hour.

fortiori the officer would have no mandatory duty to arrest if he found the abuser elsewhere after the 4 hours have passed. His authority to arrest under those circumstances is limited to his general statutory authority to arrest where he has probable cause to believe that a person has committed a felony and there would, of course, be no power to arrest for a misdemeanor since none was committed in his presence. In and of itself this 4-hour limitation is not decisive as to the present case since if the officer had gone to Barnes's mother's house, the opportunity to arrest might have occurred within the 4 hours. It does, however, appear to put an outer limit on the mandatory arrest duty and shows that the act is focused on addressing the situation when the officer confronts an abuser in the house and does not create an ongoing duty to conduct a mandatory investigation.

██ The emphasis of the statute is on prompt intervention and removal of the abuser, not on long-term protection. The statute recognizes that the abuser may be released on personal recognizance or on other terms[20] and we can take judicial notice of the fact that this may happen promptly. As emphasized in the brief of amicus curiae, Northwest Women's Legal Center, the statutory amendments were aimed at insuring that domestic violence assaults were dealt with in a similar manner to assaults between other parties, and in effect, to make equal protection a reality. The statute does not generate new or special long-term protection. The Legislature designed the act to address the "under-enforcement" of the criminal laws.[21] The law does not give a priority to domestic violence laws, but aims to have all laws equally enforced without regard to the relationship of the parties.[22]

---

[20]RCW 10.31.100(2) reads in part:
"A police officer shall arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant . . .".

[21]*See* U.S. Attorney General's Task Force on Family Violence, *Final Report* 12 (1984).

[22]RCW 10.99.010. *See also Roy*, at 358.

In the past, a common police response to domestic violence calls was to treat the matter as a family quarrel, try to mediate the situation and walk the abuser around so he could "cool off". Mandatory arrest policies eliminate this practice and require the police to treat domestic assaults the same as any other assault, arresting the offender and removing him/her from the scene. However, there will be situations when no arrest is possible, such as when the alleged abuser is not in the home. In such a case the law directs the police to offer alternate means to protect the victim.

It is not necessary to attempt to precisely define the scope of the mandatory duty to arrest in responding to a domestic violence call when the abuser is no longer present. Here, the officers did conduct a search of the immediate area and reported to Leola that they were unable to locate Barnes. Although the officers secured a possible address for Barnes, Leola told them that he would not be present at that address.[23] The officers further properly exercised their responsibility by offering to take Leola to a place of safety.[24] Under these circumstances we hold that the special relationship created by the statute terminated when Leola declined the offer. We attach great significance to the officers' offer to take Leola to a place of safety because the overriding purpose of the statute is to protect victims of domestic violence from further violence. Where the offender is present his arrest and removal serves that function. Where he is not present, taking the victim to a place of safety serves the same function. The special responsibilities placed on the police in responding to complaints of domestic

---

[23]The dissent notes Officer Burrows may have gone to Barnes's mother's house if he believed there was a duty to arrest. Officer Burrows's speculation as to what he would have done if he believed he had a mandatory duty to arrest, is irrelevant. The officer's duty to arrest and his duty to search, if there is such a duty, are to be measured by objective standards not the subjective belief of the officer. *See Scott v. United States*, 436 U.S. 128, 138, 56 L. Ed. 2d 168, 98 S. Ct. 1717 (1978).

[24]RCW 10.99.030(5) states:
"The peace officer may offer, arrange, or facilitate transportation for the victim to a hospital for treatment of injuries or to a place of safety or shelter."

violence are fulfilled when continuation or escalation of the abuse is prevented.

Police responsibility in regard to any further investigation becomes part of their overall law enforcement function and does not generate a right to sue for negligence.[25] We hold the Domestic Violence Protection Act limits the mandatory duty to arrest to cases where the offender is on the scene and does not create an ongoing mandatory duty to conduct an investigation. The claim should have been dismissed at the close of plaintiff's case and the judgment is therefore reversed.[26]

## CROSS APPEAL

Donaldson urges on cross appeal that the court erred in limiting her negligence claims. We disagree.

■ Donaldson asserts the court erred in preventing the jury from considering the City's failure to enter a protective order on the Washington Criminal Information System, and the resulting failure of the police in arresting Barnes for violating the order. We disagree. The undisputed testimony before the court was that it is impossible to enter such orders on the state-controlled system without the proper information. It was not error for the court to conclude, as a matter of law, the City did not breach a duty in failing to enter the order.[27] Likewise, if the order was not on the computer system and Leola could not provide the police with a copy, the police could not be expected to make an arrest pursuant to RCW 10.31.100(2)(a).

■ The only relevant record cited on the issue of the Value Village robbery demonstrates this negligence theory is highly speculative and could properly be kept from the jury on that basis. Second, while the City clearly owed Leola a duty pursuant to the DVPA, the Value Village robbery was not

---

[25]*Fowler*, at 45.

[26]Finding a basis to reverse the judgment below, it is unnecessary for this court to consider the City's other grounds for appeal. There is also no need to consider the cross appeal issue of contributory negligence.

[27]*See Re v. Tenney*, 56 Wn. App. 394, 399, 783 P.2d 632 (1989).

related to this duty and Donaldson can establish no general duty to arrest Barnes for robbery.

Donaldson speculates that had the police returned Leola's gun, after it was confiscated in July 1985, following her arrest for shoplifting, she would have defended herself and would still be alive. It was not improper to prevent the jury from such speculation. Additionally, there is apparently some dispute as to whether Leola was entitled to have a gun permit, and whether, therefore, the City had a duty to return the gun.

Finding, as a matter of law, the City had no ongoing duty to conduct a mandatory investigation, we reverse.

KENNEDY, J., concurs.

COLEMAN, J. (dissenting) — The majority recognizes that the Domestic Violence Prevention Act (DVPA) imposes a duty on the City to protect victims of domestic violence. A statute which by its terms creates a governmental duty to protect particular individuals can be the basis for a negligence action where the statute is violated and the injured party was one of the persons designed to be protected by the statute. *Baerlein v. State*, 92 Wn.2d 229, 232, 595 P.2d 930 (1979). The majority holds, however, that the provisions of the act do not impose a mandatory duty to conduct a follow-up search for an abuser who flees the scene. The majority, therefore, concludes that the statute was not violated. Majority, at 671. However, by declaring that it is unnecessary under the facts of this case to define the precise scope of the mandatory arrest duty, the majority leaves us with two possible interpretations — one being that the act imposes no follow-up duty whatsoever in case of the absent violator and the other that under these specific facts, further follow-up activity was not required. Inasmuch as I am in disagreement with both approaches, I respectfully dissent.[28]

---

[28]With the exceptions noted in this dissent, I am otherwise in accord with the majority's disposition of the issues. I would further note that if we had been able to conclude that the mandatory arrest provisions of the act were not invoked by Leola's complaint, then the majority's resolution would be proper. However, having resolved that issue against the City, I cannot agree with the majority's duty analysis.

The majority supports its interpretation of the statute by asserting that a mandatory duty to search for an absent abuser would be without clearly defined limits and therefore unworkable. This concern is addressed by the 4-hour time limitation contained in RCW 10.31.100(2)(b) which, instead of supporting the majority's analysis, refutes it. That subsection provides that if more than 4 hours have elapsed since the incident occurred, there is no mandatory duty to arrest. Rather than recognizing this limitation as a safeguard to prevent an inefficient use of police resources, the majority views the 4-hour limit as evidence that the act only pertains to situations in which the abuser is present when the police arrive at the scene.

This simply does not follow. It is more logical to conclude that the 4-hour provision was intended to impose outer limits on the mandatory duty to act. Thus, if the abuser can be located through a reasonable police search within 4 hours following the incident, an arrest must be made. If more than 4 hours have elapsed, the provisions of the statute relating to mandatory arrests no longer apply.

As to the other concerns raised by the majority relating to the scope and intensity of the investigation these must, by necessity, be resolved on a case-by-case basis as in any other action in tort alleging breach of duty. Depending upon the facts, some issues may be decided as a matter of law while others may require submission to a jury. This case is unique only in that the Legislature has imposed certain duties which have not heretofore existed. I do not dispute that these mandatory requirements may create enforcement problems. However, any rectification of those concerns is within the province of the Legislature, not the judiciary.

Inasmuch as the majority relies upon certain facts to justify part of its analysis, I will address whether this court can, under those facts, determine as a matter of law that the officers did all that was required under the provisions of the DVPA. Because Leola declined the officers' invitation to take her to a place of safety, the majority holds that the special relationship created by the statute terminated. I

disagree. The act focuses on the importance of arresting violators in order to promote the safety of victims. Indeed, the majority acknowledges that the overriding purpose of the statute is to protect domestic violence victims from further violence. When the offender is present, arrest and removal serves that function.

However, the majority concludes that taking the victim to a place of safety serves the same function of protecting domestic violence victims when the violator is not present. That latter conclusion is not supportable and, in itself, is insufficient to satisfy the officers' duties under the act. Further, it overlooks the effect that an arrest may have. In the first place, while the suspect is in custody the victim is safe. If the suspect is to be released, conditions of release may be imposed, including supervision. Moreover, an arrest emphasizes to the arrestee the gravity of the situation and may, in and of itself, serve a deterrent function. Simply taking the victim to a safe place does not effectively accomplish the purposes intended by the DVPA. As noted in RCW 10.99.010,

> [t]he purpose of this chapter is to recognize the importance of domestic violence as a serious crime against society and *to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide. . . . It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim* and shall communicate the attitude that violent behavior is not excused or tolerated. . . .

(Italics mine.) In those cases where it is reasonably possible to locate the suspect and effectuate an arrest, taking a victim to a place of safety — while commendable and to be encouraged — does not assure the victim of domestic violence the maximum protection from abuse which the law can provide. Likewise, offering a safe haven for the victim is not enough in itself to demonstrate an official response to domestic violence aimed at enforcing the laws to protect the victim.

As an additional justification for excusing the officers from any further duty to search for Barnes, the majority relies on testimony that Leola told the officers that Barnes would not

go to his mother's home.[29] It is important to note that there was a serious attempt to impeach this testimony.[30] In the officers' original incident report following Leola's call to the

---

[29]Although not specifically stated in the majority opinion, it is undisputed that Barnes, following the incident with Leola, did in fact return to his mother's house where he was living at the time.

[30]Officer Burrows testified as follows:

"Q: I'm going to hand you what has been marked Exhibit 34 and ask you whether that was the incident report that was made up by you?

"A: Are you referring to the first two pages?

"Q: Yes, the first two pages?

"A: Yes, that is a copy of the incident report I wrote concerning that incident.

"Q: Was that made up on the 14th after contact with Leola?

"A: Yes. After Leola, yes, it was.

"Q: Under the name of Steven Allen Barnes where it says 'relationship to the victim, ex-boyfriend,' what address is listed there?

"A: 8631-39th Avenue South.

"Q: And at that time was that the address that Leola Washington provided to you for Barnes?

"A: We used that for there was no other address to use. She said that was a mailing address for him, but not where he actually lived.

"Q: She said that she was over there earlier to pick up Christmas presents at his mother's house and she drove over there where he was with the Christmas presents?

"A: She said she drove over to his mother's house where he was.

"Q: Where he was. And you're saying that she told you that he did not stay over there? It was only a mailing address?

"A: That's correct.

"Q: You do not in that first statement on the 14th of December say that anywhere in a narrative that you wrote; is that correct?

"A: It's not in the page, or report. It's in my officer's statement.

"Q: But the officer's statement came December 15th after she was killed; did it not?

"A: That's correct.

"Q: I'm talking about before she was killed when things were being justified — I'm asking for before on the 14th. Is there any indication in your report that she said that he lives in Edmonds and his mother's address was only a mailing address?

"A: I don't believe it is in the major report anywhere.

"Q: At that time she told you — what else did she tell you about that address?

"A: Which address?

"Q: His mother's address?

"A: That's basically all. She told me it was a mailing address for Mr. Barnes. He did not live there. He lived in Edmonds.

"Q: She told you he would not be going there?

"A: That's what she told me."

police, there was no reference to this information. The statement that he would not go to his mother's home appeared for the first time in reports prepared following the homicide. The plaintiff's expert witness, in opining that the officers had a duty to check that address in an effort to locate Barnes, testified that he attached little weight to Leola's alleged statement because it did not appear in the first report.[31] This may have prompted the jury to attach significance to this discrepancy in determining whether Leola made the statement. The jury's determination of what information the officers had concerning Barnes's whereabouts could have influenced their determination of the case.

It is of greater significance to me, however, that Officer Burrows himself attached little, if any, importance to Leola's statement when he assessed his follow-up responsibilities.[32] The clear inference from Burrows' testimony is that he would have gone to this address (the only address he had for Barnes) if he had felt that Barnes's actions triggered the mandatory arrest provisions of the act. Officer Burrows consistently testified that, based upon the facts known to him, he did not believe he had a mandatory duty to arrest. This, indeed, was the City's theory at trial and before this court — a theory that was properly rejected by the majority, which held "that if Barnes had been found on the scene, the officers . . . would in fact have [had] a duty to arrest[.]" Majority, at 671. However, the officers' actions were not motivated by their belief that they had no duty to

---

[31] I may be of the view that this omission is insignificant and does not bear upon the witnesses' credibility, but I am not the trier of fact.

[32] Officer Burrows testified as follows:
"Q: Let me ask you something. If you have an address of a [suspect] of domestic violence and so forth, apart from this, in the ordinary course of events if you have a specific address, do you normally check it out?
" . . . .
"A: It depends if it's a mandatory arrest under the domestic violence law or not.
"Q: So if it's a mandatory arrest, then you would go to the address?
"A: Yes.
"Q: If it's not a mandatory arrest, then you wouldn't go?
"A: Well, it depends on the circumstances."

investigate because the abuser was not present. Their actions were motivated based upon their belief that this was not a mandatory arrest situation; hence, in their view there was no mandatory duty to locate Barnes as quickly as possible in order to arrest him.

While I appreciate the majority's desire to determine limits in a difficult area, neither the facts nor the law supports the conclusion reached here. In short, I would affirm the judgment entered by the Superior Court.

Review dismissed at 120 Wn.2d 1031 (1993).