IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72712-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CURTIS WAYNE RODGERS, JR., | ) | |
| | ) | |
| Appellant. | ) | FILED: March 28, 2016 |

SCHINDLER, J. — Curtis Wayne Rodgers Jr. contends insufficient evidence supports the jury conviction of tampering with a witness in violation of RCW 9A.72.120(1)(a). Viewing the facts in the light most favorable to the State, we hold a rational jury could find Rodgers guilty, and affirm.

FACTS

Amanda Eskola and Curtis Wayne Rodgers Jr. started dating in September 2012.

Around noon on May 10, 2013, Rodgers went to meet Eskola at her office in downtown Seattle to borrow her Apple iPhone. Rodgers told Eskola he would get together with her after she got off work at 5:30 p.m. Rodgers did not meet her as planned. Eskola tried calling Rodgers a number of times but could not reach him.

Eskola was angry Rodgers did not meet her downtown and she "couldn't get a hold of him." Eskola used the tracking device to locate her iPhone. The tracking device showed the iPhone in a North Seattle location near the house where Rodgers' twin sister Christine Williams lived with Jason Rice and their three children.

> I couldn't get a hold of him. I called him a lot of times and couldn't get a hold of him, and so, um, then he had — he had my iPhone, so there was tracking on it. And I tracked him to North Seattle. And that was right, like literally down the street, by where his sister lived. And I was getting pretty angry at this point, because he was supposed to meet, and he didn't meet me, and I couldn't get a hold of him.

Eskola left Rodgers a voicemail on her iPhone telling him, "I'm coming up there to get my phone back since you're not coming downtown. Can you please meet me at [Ch]ristine's house?"

When Eskola arrived, Williams and Rice were at home with the children. Eskola used the computer and located her iPhone near Aurora Avenue North. Williams agreed to go with Eskola to find Rodgers.

Eskola and Williams drove Rice's SUV[1] to Aurora Avenue North. Eskola parked the car in a motel parking lot. Eskola inadvertently locked the SUV keys and Williams' cell phone in the car. Eskola and Williams "started asking people" if they had seen Rodgers.

After approximately two hours of looking for Rodgers, someone offered to use a crowbar to open the SUV car door. After they got back in the car, Williams saw Rice had called a number of times on her cell phone. Before they left, Rodgers called and agreed to meet Eskola in the parking lot. Eskola and Rodgers argued, "causing a huge

---

[1] Sport utility vehicle.

2

scene" in the parking lot.

> Yeah, when we got the keys out of the car, finally, and got back into the car, [Rodgers] called me, and then he came out. I was very upset with him at this point, because I hadn't been able to get a hold of him all day. So we had a big argument in the parking lot. He tried — I believe he tried to give me the phone back, but we had just been arguing back and forth to the point that like we were causing a huge scene in this parking lot. And it didn't help that I had just — the keys had been locked in the car for the last two hours. So that was also really frustrating. Like the night was just going in a bad direction. And so we had an argument in the parking lot over just everything: him not showing up, the phone, whatever. We were causing a big scene, and we were in the parking lot, so it was kind of a bad, just not good.

Rodgers walked away with Eskola's iPhone still in his possession. Williams talked Eskola into leaving and driving back to her house. When Williams and Eskola arrived at the house, Rice was upset because he had not been able to get ahold of Williams and about the damage to the car from using a crowbar to open the door.

At some point, Rodgers called Rice on his cell phone. Rodgers told Rice he wanted to talk to Williams and Eskola. Williams and Eskola refused to talk to Rodgers. Before he went to bed, Rice told Williams, Eskola, and the children that he "didn't want anybody in the house." Eskola stayed up with the children to watch television.

Around midnight, Eskola heard Rodgers "pounding on the door" like he was "gonna break it down." Eskola did not "answer the door because Jason didn't want [Rodgers] to come in" the house.

Eleven-year-old C.R. went to get his father to tell him Rodgers was in the house. Rice and Rodgers fought about "him being in the house." When they started fighting, C.R. ran to a nearby fire station for help.

Meanwhile, Eskola called 911 and told the operator, "[M]y boyfriend's here and he's trying to hurt people and I just need cops to come out here." Eskola told the 911 operator that Rodgers "just attacked me and he just attacked my brother-in-law."

The 911 operator contacted patrol officers to report a "DV[2] disturbance." The dispatcher told the officers that the suspect was described as "a black male, 37 years old, wearing a bandana, black clothes, and glasses, named Rodgers."

Fire Department Captain Michael Gagliano and firefighter Richard Powers heard C.R. rapidly knocking on the glass station door. C.R. was "shaking" and "obviously really scared."

> [H]is voice was trembling. He was — he kind of had like a washed-out look, like a pale look. His hands were shaking. He just had that wide-eyed look that I think most of us would associate with just being very fearful, very scared. He said he had run down the — he had run down the alley.

C.R. asked Captain Gagliano, "Can you help me? . . . My uncle is going to kill my dad." C.R. identified Rodgers as his uncle and told Captain Gagliano that Rodgers was "pulling on his auntie's leg." Captain Gagliano called 911.

Seattle Police Department Officer Steven Stone and Officer Tim Owens responded to the 911 call and arrived at Williams' house just after midnight on Saturday, May 11. Officer Stone saw "a Black male wearing all dark clothing . . . attempting to leave." Based on the "description, the proximity, the time, the location, . . . [and] the clothing," Officer Stone detained Rodgers.

Rice came out of the house to ask the police about his son. Officer Stone told Rice that C.R. was at the fire station and had contacted the police. Officer Stone "asked

---

[2] Domestic violence.

4

Rice if we detained the correct person, and he said yes." Officer Stone arrested Rodgers. Eskola and Rice gave written statements to the police.

In her written statement, Eskola said Rodgers "started knocking on the door. After a few minutes passed by and after we refused to let Curtis in, Curtis came in through an unlocked door by the garage." Eskola stated, "I was on the couch when Curtis grabbed me by my leg and dragged me off the couch. . . . Curtis then grabbed me by my hair, and threw me down to the ground."

In his written statement, Rice told police that Rodgers threatened him earlier that day and he told his son C.R. not to let Rodgers in the house. Rice told police that he heard Eskola scream "help me" and "get off me." Rice said Rodgers punched him in the mouth, tried to punch him a couple more times, and the two of them ended up wrestling on the floor.

Rice then left to go get C.R. Captain Gagliano testified Rice had cuts on his hands and face that "appeared to be recent." C.R. refused to return home until the police assured him that Rodgers was in handcuffs in the back of a police car.

Officer Stone drove Rodgers to the precinct to complete the booking information and prepare an affidavit of probable cause before taking him to the King County jail. Officer Stone included the statements Eskola and Rice made to the police in the affidavit of probable cause. Before taking Rodgers to the jail, Officer Stone e-mailed a judge the affidavit of probable cause that contained the statements from Eskola and Rice.

At approximately 3:00 p.m. and again at approximately 3:30 p.m. on Saturday, May 11, Rodgers called Eskola from the King County jail. Rodgers asked Eskola not to

file charges and to retract the statement she gave the police. Eskola asks, "[T]he only thing you're charged with is the burglary right?" In response, Rodgers tells Eskola that "the police was tellin' me that oh yeah you gotta—I got an assault four . . . against [me]" also. Rodgers told Eskola that because she told the police that he broke into the house and pulled her hair, he was being charged with "burglary domestic violence" and assault four, and on Monday, the court would impose a no-contact order, "they're gonna put a no-contact order on—on uh—Monday they're gonna put a no-contact order on—on you for me."

During the call from the jail on Sunday, May 12, Rodgers tells Eskola again that because she told the police he pulled her hair, there would be "a no-contact order on us." Eskola told Rodgers that she did not tell the police that he was "trying to injure people," she just told the police "what happened and that was it."

> I have never seen any man do anything like that to anybody in my life ever. So I didn't know what to do. I didn't know what the smart thing to do was . . . . I didn't tell them that you're trying to injure people. I told them just what happened and that was it.

At the probable cause first appearance hearing on Monday, May 13, the district court set bail at $50,000 and imposed a no-contact order.

On Wednesday, May 15, Eskola called lead Detective Jason Stolt to "recant her original statement" and "re-clarify some of the points." Eskola told Detective Stolt she let Rodgers into the house, she "shoved" Rodgers, and he did not assault her or Rice. Eskola also told Detective Stolt that she had not had any contact with Rodgers since May 11 and no one had asked her to recant her statement.

Detective Stolt listened to the 911 call again and confirmed Eskola said Rodgers

"attacked" her and Rice. The "Case Investigation Report" entry states, in pertinent part:

On 05-15-13, Amanda called to recant her statement. She provided a recorded statement. She states that she let Curtis in the house and he did not assault her. She also states that she didn't see Curtis assault Jason. I asked her about [C.R.]'s statement to Officers about seeing Curtis pulling her leg "out of the socket". She reaffirmed that Curtis did not assault her and that she shoved him. Based on my experiences with intimate relationships in Domestic Violence cases, it is very common for a victim to recant their original statement a few days after the attack despite physical evidence that disputes the recant. I also reviewed the 911 recording when Amanda called. I recognize her voice on the line as she says she was attacked by her boyfriend and now he was attacking her brother-in-law.

On May 15, the State charged Rodgers with residential burglary in violation of

RCW 9A.52.025 and assault in the fourth degree of Eskola and Rice in violation of RCW

9A.36.041. The State alleged the crimes constituted domestic violence as defined

under RCW 10.99.020. The information attaches the certificate of probable cause and

the Case Investigation Report prepared by Detective Stolt.

Based on new information, the State requested the court increase the $50,000

bail amount set by the district court at the first appearance on Monday, May 13. The

"Request for Bail" states, in pertinent part:

At first appearance, the district court set bail at $50,000 despite the State's request for higher bail. Because the State has since received new information regarding [Rodgers'] 2009 Assault 3rd Degree DV conviction, the State requests that bail be increased to $150,000, pursuant to CrR 2.2(b)(2)(i) and (ii).

At the beginning of trial, the State made a motion to amend the information to

consolidate the residential burglary and fourth degree assault charges as count 1 and

based on the recorded jail calls with Eskola, add a witness tampering charge as count

2. The court granted the motion to amend to consolidate and add the witness

7

tampering charge.[3] The amended information charged Rodgers with tampering with a witness in violation of RCW 9A.72.120(1) and alleged the crime constituted domestic violence as defined under RCW 10.99.020. The amended information states, in pertinent part:

### Count 2 Tampering With A Witness

That the defendant Curtis Wayne Rodgers, Jr., in King County, Washington, between May 11, 2013 and May 15, 2013, did attempt to induce a witness, or a person he had reason to believe was about to be called as a witness in any official proceeding . . . ;

    . . . .

And further do accuse the defendant, Curtis Wayne Rodgers Jr., at said time of committing the above crime against a family or household member; a crime of domestic violence as defined under RCW 10.99.020.

The State called a number of witnesses to testify at trial including police officers, Eskola, Captain Gagliano, and Rice. Williams refused to allow C.R. to testify at trial.

Eskola testified that she and two of the children were watching television when she heard Rodgers "knocking on the door."

Curtis started knocking on the door and I knew Jason at this point was in bed, but I don't remember him being sleeping, I just knew he was in the back room. And I felt really weird because it wasn't my house — about

---

[3] The amended information charged Rodgers with burglary in the first degree domestic violence in violation of RCW 9A.52.020 and 10.99.020 as count 1.

Count 1 Burglary In The First Degree - Domestic Violence

That the defendant Curtis Wayne Rodgers, Jr., in King County, Washington, between May 10, 2013 and May 11, 2013, did enter and remain unlawfully in a building located at 10341 Stone Ave N., Seattle, in said county and state, with intent to commit a crime against a person or property therein, and in entering, and while in such building and in immediate flight therefrom, the defendant did assault a person, to-wit: Amanda Eskola and Jason Rice;

Contrary to RCW 9A.52.020, and against the peace and dignity of the State of Washington.

And further do accuse the defendant, Curtis Wayne Rodgers Jr., at said time of committing the above crime against a family or household member; a crime of domestic violence as defined under RCW 10.99.020.

just letting him in, because I knew Jason had been upset with us the whole night. So I — [C.R.] ran downstairs and wanted to answer the door. And I told him, like, I don't know [C.R.], why don't you go ask your dad if it is OK to answer the door.

Eskola testified that she opened the door to let Rodgers inside the house. "I don't remember ever getting a response from Jason saying, no don't open it or yes, open it. But I ended up opening the door for Curtis and letting him in."

Eskola testified she was upset with Rodgers and "shoved" him.

I was really upset with him, and arguing with him. And then we had — we were arguing back and forth, again, about just the same things we had been arguing before, earlier in the day. And then I actually shoved him because he was getting too close to my face. Like shoved him back, and then sat on the couch. And that's most of what I can remember. I don't know.

Eskola testified that after she shoved Rodgers, he grabbed her ankle and then immediately turned and walked away.

A    So then he just came over and he grabbed my leg. . . . I honestly can't even remember what was said between us. Because it — . . . it just is kind of a blur . . . . But then I remember him just like, literally, like turning away instantly and going into the other room. Like as a pretty abrupt.

Q    OK. What part of your leg did he grab?

A    My ankle.

Q    And what did he do once he grabbed your ankle?

A    He — I think he just grabbed it, and like looked at me or said something, and then literally turned away.

Eskola said she lied because she did not want Rice to know that she had let Rodgers into the house.

I had told the officers that [Curtis came in through an unlocked door by the garage] because Jason was also standing outside with me at that point, and I did not want Jason to know that I had actually let Curtis in. Because he was visibly very upset by the whole situation and had just told me he wanted me to leave his house. To which I refused to leave his house. So I felt really weird about letting him know that I had let Curtis in the door.

9

Eskola also testified that she wanted "to get back" at Rodgers. "I was pretty shooken up, just by, I think, the whole events of the day. And I think there was part of me that was trying to get back at him a little bit for how upset I was by this point."

The court admitted into evidence Eskola's call to 911, a transcript of the 911 call, the recorded calls Rodgers made to Eskola from the jail, and a transcript of the jail calls. The State played the recordings for the jury.

Rice testified he told C.R. he did not want "anybody else but our family in the house" that night. Rice said after C.R. came to get him, Rice "got up out of bed" and started yelling at Rodgers: " 'Why, why is, why are you in the house. I don't want anybody in the house.' " Rice said he and Rodgers argued about Rodgers "being in the house." Rice said, "We got loud. And then finally after a couple minutes of shouting, he went outside." Rice testified that he did not remember whether he was injured that night.

> Q  . . . [D]id you have any injuries that evening?
> A  Uh, no.
> Q  Did you have an injury to your face? Any sort of scratches or cut lip?
> A  I don't remember if I did or not.
> Q  You don't remember?
> A  I don't.
> Q  Why wouldn't you remember?
> A  I just don't remember if I had any cuts or any scrapes or anything.

Rice emphatically denied Rodgers hit him.

> Q  So, . . . let me ask this question: You talked about there was an argument between you and Curtis, was there a point where that argument turned into a physical fight?
> A  No.
> Q  Was there ever a point where Curtis hit you in the face?
> A  No.
> Q  Ever a point where the two of you were wrestling on the ground?
> A  No.

10

Rice testified that on May 10, Rodgers was living at their house in the downstairs bedroom next to the kitchen.

Williams testified on behalf of the defense. Williams testified that as of May 10, Rodgers had been living with them for three weeks. Williams said Rodgers moved into their house in late April 2013 and stayed in the downstairs bedroom. Williams testified that before Rodgers moved in, he visited every day and was always "welcome to come in."

The jury was unable to reach a verdict on count 1, burglary in the first degree and assault in the fourth degree. The jury convicted Rodgers of tampering with a witness, count 2. With an offender score of 11, his standard sentencing range was 51 to 60 months. Rodgers requested a special drug offender sentencing alternative under RCW 9.94A.660. Over the State's objection, the court sentenced Rodgers to a prison-based special drug offender sentencing alternative.

## ANALYSIS

Rodgers argues insufficient evidence supports his conviction for tampering with a witness in violation of RCW 9A.72.120(1)(a).

In reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Witherspoon, 180 Wn.2d at 883. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most

strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

The State has the burden of proving the elements of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). Under the Fourteenth Amendment and the Sixth Amendment to the United States Constitution and article 1, section 21 and 22 of the Washington State Constitution, a criminal defendant is entitled to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)[4] (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)); State v. Polo, 169 Wn. App. 750, 762-63, 282 P.3d 1116 (2012); State v. Johnson, 185 Wn. App. 655, 666, 342 P.3d 338 (2015).

> RCW 9A.72.120(1) defines "tampering with a witness," in pertinent part:
>
> A person is guilty of tampering with a witness if he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding . . . to:
> (a) Testify falsely.

The court used the defense proposed instructions to instruct the jury on witness tampering. Because neither party took exception, the instructions are law of the case. Witherspoon, 180 Wn.2d at 884. The court instructed the jury that to convict Rodgers of tampering with a witness, the jury must find beyond a reasonable doubt that Rodgers "attempted to induce a person to testify falsely" and that "the other person was a

---

[4] Alteration in original.

witness or a person the defendant had reason to believe was about to be called as a witness in any official proceedings." Jury instruction 15 states, in pertinent part:

> To convict the defendant of the crime of tampering with a witness as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That between May 11, 2013 and May 15, 2013, the defendant attempted to induce a person to testify falsely; and
> (2) That the other person was a witness or a person the defendant had reason to believe was about to be called as a witness in any official proceedings; and
> (3) That the acts occurred in the State of Washington.

Jury instruction 16 defines "official proceeding" as "a proceeding heard before any legislative, judicial, administrative or other government agency or official authorized to hear evidence under oath." A supplemental jury instruction defines "induce" as "to move and lead, influence, persuade, to inspire, call forth, or bring about by influence or stimulation."

Rodgers relies on State v. Pella, 25 Wn. App. 795, 612 P.2d 8 (1980), to argue insufficient evidence supports the jury finding that Eskola was "a witness" or that she was a person Rodgers "had reason to believe was about to be called as a witness in any official proceedings." Pella does not support his argument.

In Pella, juvenile offender Jeffrey Pella threatened 13-year-old Eric Goodman that "unless Eric paid $50 to [Pella] and two friends, Mark Grubbe and Allen Humphries, [Pella] would tell the police that Eric started a fire in a garage." Pella, 25 Wn. App. at 796. Goodman contacted the police and gave a statement. The next day, Pella told Goodman that "unless he told the police that the charges were unfounded, [Pella] would kick [his] 'ass.' " Pella, 25 Wn. App. at 796.

No. 72712-5-I/14

The State charged Pella with extortion in the first degree and intimidating a witness under former RCW 9A.72.110 (1975).[5] Pella, 25 Wn. App. at 796-97. Former RCW 9A.72.110(1) states, in pertinent part:

> A person is guilty of intimidating a witness if, by use of a threat directed to a witness or a person he has reason to believe is about to be called as a witness in any official proceeding, he attempts to:
> (a) Influence the testimony of that person.

The juvenile court found Pella guilty as charged of extortion and intimidating a witness. Pella, 25 Wn. App. at 796.

Pella appealed the conviction for intimidation of a witness. Pella argued he "had no reason to believe that Eric was about to be called as a witness in an official proceeding." Pella, 25 Wn. App. at 797. The court agreed and reversed. The court held that because the State had not filed an information charging Pella with a crime, "an official proceeding was not pending at the time the threat was made." Pella, 25 Wn. App. at 797. The Pella court cites State v. Howe, 247 N.W.2d 647 (N.D. 1976), and United States v. Metcalf, 435 F.2d 754 (9th Cir. 1970), for the proposition that an "official proceeding" begins "at the earliest, with the filing of a complaint." Pella, 25 Wn. App. at 797. As in Pella, the defendents in Howe and Metcalf were not in custody and no charges had been filed. Pella, 25 Wn. App. at 796; Howe, 247 N.W.2d at 650; Metcalf, 435 F.2d at 755.

Here, unlike in Pella, the evidence supports finding that Rodgers attempted to induce Eskola to testify falsely and had reason to believe Eskola was about to be called as a witness in an official proceeding. Rodgers was booked into the King County jail on Saturday, May 11. The record shows Rodgers knew Eskola had given the police a

---

[5] LAWS OF 1975 1st Ex. Sess., ch. 260, § 9A.72.110.

14

written statement alleging domestic violence assault and the testimony of Eskola was critical to the determination of whether charges would be filed against him. Rodgers knew there was a first appearance probable cause hearing scheduled for Monday, May 13, and charges would be filed and a no-contact order would be imposed.

Viewing the evidence in the light most favorable to the State, the record shows Rodgers was arrested on May 11, 2013 for a domestic violence incident. Under state law, the police have a mandatory duty to arrest if the suspect committed an assault against a family or household member. RCW 10.99.030(6)(a); RCW 10.31.100(2)(c); see also Donaldson v. City of Seattle, 65 Wn. App. 661, 669-71, 831 P.2d 1098 (1992) (police officer has a mandatory duty to arrest if there are grounds to do so under the domestic violence prevention act, chapter 10.99 RCW).

There is no dispute that police booked Rodgers in the King County jail in the early morning hours of May 11 and that Rodgers knew the police arrested him for a domestic violence incident. The evidence shows Rodgers knew he was being held pending a probable cause hearing in court on Monday, May 13; that charges would be filed and a no-contact order entered. Under CrR 3.2.1(a), a person "shall have a judicial determination of probable cause no later than 48 hours following the person's arrest." Where a person is arrested for a domestic violence crime, the court has the authority to impose a no-contact order at the first appearance probable cause hearing. RCW 10.99.045(3)(a). When making a probable cause determination, a court "may consider affidavits . . . or sworn testimony, and further may examine under oath the affiant and any witnesses the affiant may produce." CrR 3.2.1(b).

15

At the beginning of the call from the jail at approximately 3:00 p.m. on May 11, Rodgers asked Eskola not to pursue charges against him. "I was wonderin'. Baby, baby are you pressin' charges on me baby?" Eskola told Rodgers that she would not press any charges against him but she thought Rice was going to do so. Rodgers told Eskola, "Jason will drop the charges."

Eskola asked Rodgers, "[T]he only thing you're charged with is the burglary right?" Rodgers said that because Eskola told the police in her written statement that he broke into the house and pulled her hair, "[t]his is domestic violence. I got a . . . burglary domestic violence" and "the police was tellin' me that oh yeah you gotta—I got an assault four. An assault four . . . against you."

Rodgers told Eskola that on Monday, the court would impose a no-contact order "on you and Jason."

> [B]aby you know I'm gone right? You know I'm—I'm gonna be gone for a long time now right? You know that? Huh? And they put a—they put a no-contact order on you. There's gonna be a no-contact order Monday on you and Jason. You gave a police report.

Rodgers says that when the court imposes a no-contact order, he and Eskola would need to use "AKA's and . . . anonymous names."

RODGERS: Man they're—they're gonna put a no-contact order baby. We're gonna have a no-contact order on us. I—I cannot be—I can—I cannot come home if I wanted to now.
[ESKOLA]: I didn't . . . . It's not what I wanted.
RODGERS: I could not home [sic] if I wanted to now. Now—now we gotta be a little bit more swifter about it. Now you got to—gotta use uh—uh AKA's and um anonymous names now. You hear me? You hear me?

16

Rodgers tells Eskola he was crying, he did not want to lose her, and promised he would change.

> [ESKOLA]: Curtis are you—are you done with this stuff? Like are you done? Like 'cause I am.
>
> RODGERS: I'm done baby. I'm super done. I swear to god. And you know what fuckin' disturbs me? Baby even though—. . .
>
> [ESKOLA]: (Unintelligible).
>
> RODGERS: baby listen baby I'm sittin' here with tears in my eyes baby and what disturbs me baby is—is you. I swear to god, even though I act like an asshole towards you, I swear to god I don't wanna lose you baby. I swear to god I don't wanna.
>
> RODGERS: um I'm wipin' the tears off the front of eyes [sic] in jail and shit. Well listen, I—I don't—I—I—I cannot even go into the—I'm not even gonna go into why I did what I did. It's—this is what we're workin' with now. This is what—this is what it is right now. Now—. . .
>
> [ESKOLA]: I know but (unintelligible).
>
> RODGERS: yeah. Now this is where—we're—this is the bridge that we're at right now
>
> [ESKOLA]: It was crazy last night. I'm like watching all these little kids and they—they got scared because of you. You know?
>
> RODGERS: (Unintelligible). I never wanted to—I never wanted to expose that to—.

Rodgers also tells Eskola on May 11 that she will be a witness at trial and she needs to retract the statement she made to the police.

> RODGERS: . . . [I]f I take it to trial they're gonna call you as a witness. And what you gonna tell 'em? Huh?
>
> [ESKOLA]: I mean I already gave a statement. I can't tell 'em anything more than I already told 'em.
>
> RODGERS: Retract that statement lady.
>
> [ESKOLA]: You can do that?
>
> RODGERS: Yeah. What do you mean?
>
> [ESKOLA]: I don't know Curtis. I've never. . .
>
> RODGERS: Baby.
>
> [ESKOLA]: done any of. . .
>
> RODGERS: Baby.
>
> [ESKOLA]: this stuff before.
>
> RODGERS: Baby. I'm tellin' you. I know. It's alright.

Rodgers then tells Eskola, "We can get outta this but I need your help."

RODGERS: . . . I'm gonna take it to trial. I'm—gonna tell 'em that [C.R.] opened the door. I'm gonna tell 'em the door was unlocked. I (unintelligible). The door was unlocked. You know?

. . . .

RODGERS: We can get outta this. We can get outta this but I need your help. Huh?

[ESKOLA]: I know Curtis. I just—I feel like so bad about everything and I don't want you to be away for so long.

RODGERS: You? I don't wanna be away for—come on man. Think (unintelligible) I feel. . . . I'm like this is crazy. How did I le— man. So if I can twist outta this fuckin' noodle.

Viewing the evidence in the light most favorable to the State, sufficient evidence supports the jury finding Rodgers guilty of the crime of tampering with a witness in violation of RCW 9A.72.120(1)(a), and we affirm.[6]

WE CONCUR:

---

[6] The arguments Rodgers raises in the statement of additional grounds are without merit. Officer Stone had probable cause to arrest Rodgers and did not violate his Fifth Amendment rights by asking for his name before advising him of his Miranda rights. U.S. CONST. amend. V; Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).